*1* FILED
2015 Jan-30  PM 12:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION


UNITED STATES OF AMERICA,      *
                                        1:14-cr-333-AKK-JEO
                               *
     vs.                          December 15, 2014
                               *  2:30 p.m.
RICK LEE EVANS,
                               *  Birmingham, Alabama
          Defendant.
                               *

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE STACI G. CORNELIUS
UNITED STATES MAGISTRATE JUDGE

* * * * * * * * * * * * * * * * * * * * * * * *  * * * * *


For the USA:          Brad Felton
                      Jacquelyn Hutzell


For the Defendant:    Rick L. Burgess
                      Sabra M. Barnett


Court Reporter:       Leah S. Turner, RMR, CRR
                      Federal Official Court Reporter

WITNESSES:

**SCOTT SALSER**

Direct Examination by Ms. Hutzell ................. 6

Voir Dire by Mr. Burgess ......................... 13

Direct Examination resumed by Ms. Hutzell ......... 15

Cross-Examination by Mr. Burgess ................. 16

Redirect Examination by Ms. Hutzell ............... 27

Recross-Examination by Mr. Burgess ............... 28

**CARROLL WILSON**

Direct Examination by Mr. Burgess ................. 34

Cross-Examination by Ms. Hutzell ................. 37

Redirect Examination by Mr. Burgess ............... 38

1    This cause came to be heard and was heard on the
2  15th day of December 2014, before the Honorable Staci G.
   Cornelius, United States Magistrate Judge, holding court for
3  United States District Court, Northern District of Alabama,
   Eastern Division, in Birmingham, Alabama.

4    Proceedings continued as follows:

5    P R O C E E D I N G S

6    (COURT CALLED TO ORDER.)

7    THE COURT:  We are here in the matter of the United

8  States of America versus Rick Lee Evans.  The case number is

9  1:14-cr-333-AKK-JEO.  This matter is set for an arraignment

10 and a detention hearing.

11    The Government is represented in this matter by

12 Ms. Jackie Hutzell and Mr. Brad Felton.  The defendant is

13 present with his appointed counsel, Mr. Rick Burgess and

14 Ms. Sabra Barnett with the office of the Federal Defender.

15    Mr. Evans, when I saw you last week, I explained

16 your constitutional rights.  Do you have any questions about

17 those rights?

18    THE DEFENDANT:  No, ma'am.

19    THE COURT:  I also mentioned that you had been

20 charged with an indictment.  Have you all received a copy of

21 the indictment?

22    MR. BURGESS:  We have, Your Honor.  We would waive

23 the reading of the indictment and enter a plea of not guilty.

24    THE COURT:  Mr. Evans, you have been served with a

25 copy of the indictment in this case, and you are entitled to

1  have the indictment read to you formally in open court, but

2  your attorney has indicated that you wish to waive the formal

3  reading of the indictment.  Is that, in fact, your wish?

4           THE DEFENDANT:  Yes, ma'am.

5           THE COURT:  Have you had an opportunity to go over

6  the indictment with your counsel?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  Do you have any questions regarding the

9  charge in the indictment?

10          THE DEFENDANT:  Not at this time.

11          THE COURT:  To the indictment, do you enter a plea

12 of not guilty?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  A plea of not guilty will be entered.

15          As I said, again, the Government is requesting

16 detention.  Are you all both ready to proceed with the

17 detention hearing?

18          MR. BURGESS:  Yes, Your Honor.

19          MS. HUTZELL:  Yes, Your Honor.

20          THE COURT:  Ms. Hutzell, you may proceed.

21          MS. HUTZELL:  Your Honor, I would like to start by

22 saying that it's clear that there is no condition or

23 combination of conditions that will reasonably assure the

24 appearance of the defendant or the safety of the community in

25 this case without detention.

1    First and foremost, the grand jury found probable

2  cause and indicted the defendant for violating 18 U.S.C. --

3    MR. BURGESS:  Your Honor, are we doing this by

4  proffer, or is the Government going to call witnesses?

5    THE COURT:  Ms. Hutzell?

6    MS. HUTZELL:  We will be calling witnesses.  I was

7  just going to summarize before I did.

8    THE COURT:  All right.  You may continue.

9    MS. HUTZELL:  The grand jury found probable cause

10  and indicted the defendant for violating 18 U.S.C. 2241(c),

11  which is aggravated sexual abuse of a child.  This finding

12  invokes the presumption of detention pursuant to 18

13  U.S.C. 3142(e)(3), and while this presumption exists based on

14  the serious nature of the violation, there's also an

15  overwhelming basis in this case for detention specific to this

16  defendant and these allegations, including risk of flight.

17    He is employed as a truck driver, which is transient

18  by nature.  He also essentially is available to a nationwide

19  network that is presumably unaware of the charges he is facing

20  here.  He also has out-of-country connections.  As will be

21  seen in the pretrial sentences report, he has a passport but

22  is unaware of where it is located.  And the severity of the

23  sentence; the defendant is facing a mandatory minimum of 30

24  years in prison for this violation.

25    And as far as the danger to the community, the very

1    nature of these charges, which we will hear about, and also

2    that he currently lives with his fiance and her two children.

3    And finally, that he has been convicted of possessing child

4    pornography in Germany.

5         In short, because of all this, the Government is

6    asking for detention, and we request permission to call

7    witnesses, Your Honor.

8         THE COURT:  All right.  You may proceed with your

9    first witness.

10        MS. HUTZELL:  The Government calls Agent Scott

11   Salser.

12                         **SCOTT SALSER,**

13   called as a witness by the United States, after having been

14   sworn to speak the truth, testified as follows:

15                     **DIRECT EXAMINATION**

16   **BY MS. HUTZELL:**

17   **Q**    Agent Salser, where do you work?

18   **A**    Alabama Law Enforcement Agency, Cyber Crimes Task Force.

19   **Q**    What do you do there?

20   **A**    I work the cyber crimes, child exploitation cases

21   basically.

22   **Q**    Agent Salser, what are the allegations in this case?

23   **A**    That the defendant is -- sexual assault of a child.

24   **Q**    And tell us about this.  Where did this occur?

25   **A**    It occurred in Germany when the defendant was living in

1  that country and he was friends with the victim's parents.

2  **Q**    Tell us a little more about that.  How did this come

3  about?

4           MR. BURGESS:  Your Honor, I object.  I know hearsay

5  is admissible, but this man obviously was not there, so he has

6  got to be reading reports from somewhere else, and there has

7  been no foundation to show where that comes from or how

8  reliable they are.

9           THE COURT:  Overruled.

10 **BY MS. HUTZELL:**

11 **Q**    Agent Salser, are you familiar with this case?

12 **A**    Yes, ma'am.

13 **Q**    Tell us more about the allegations you're referring to.

14 **A**    The defendant was living in Germany and was friends with

15 the victim's family as well, her parents.  The parents and the

16 victim were going to be deployed.  They were both in the

17 military.  They were going to be deployed and the defendant

18 and his wife at the time had offered to allow the victim to

19 live with them while they were on their deployment.

20          Therefore, they would have easier access if they

21 were ever to return to Germany for short trips, whatever, and

22 they could visit with the victim.

23 **Q**    And what happened while the victim was staying with the

24 defendant?

25 **A**    The child was sexually assaulted.

1    **Q**     How old was the child?

2    **A**     She was between the ages of four and five.

3    **Q**     And how did this come to light?

4    **A**     The victim was living in the United States during a

5    different deployment of her parents.  She was living with her

6    grandmother.  And one night the victim was taking a bath and

7    she had gotten out of the bathtub and was drying off, and as

8    she was drying off she began to dance around the room

9    provocatively, and her grandmother asked her what she was

10   doing and she stated that she was dancing sexy like Mr. Rick

11   had taught her to do.

12           The grandmother then consulted with her husband, who

13   stated that while he was out one day shopping with the victim,

14   she asked could they buy movies.  He agreed.  And when they

15   went to look for movies, she said she wanted to buy sexy

16   movies like Mr. Rick used to show her.

17           They then talked to the parents, who then took the

18   child to the Child Advocacy Center here in Birmingham where

19   she was interviewed.

20   **Q**     What did the child disclose at the Advocacy Center?

21   **A**     She stated that Mr. Rick had taught her how to kiss and

22   how to have boyfriends.  She stated that Mr. Rick had a

23   monster in his pants and that was what he had named it, was

24   his monster.  She said that when Mr. Rick took his monster out

25   of his pants, he could make it do tricks.  And he liked for

1   her to touch his monster, and she made her hands in an

2   up-and-down like a stroking motion.  And she said that

3   sometimes when she touched it, white stuff would come out of

4   the end of it.

5   **Q**    And, Agent Salser, are you aware of any physical evidence

6   that corroborates the victim's allegations?

7   **A**    Yes, ma'am.

8   **Q**    What is that?

9   **A**    In Germany the authorities there executed a search

10  warrant on the defendant's residence, where they recovered

11  child pornography.  He was then convicted of possession of

12  child pornography.

13          And also the victim had disclosed during her

14  interview about a toy that Mr. Rick called the ice man, and

15  that the authorities then talked to his now ex-wife and she

16  corroborated that story saying that he had a sex toy that was

17  made of clear plastic and he named it the ice man because it

18  was clear.

19          And then it was also found out that the defendant

20  was in violation of the no-touch policy at the day care in

21  Germany.

22  **Q**    Tell us a little more about that no-touch policy

23  violation.

24  **A**    The defendant was observed by fellow employees taking

25  little girls and placing them on his lap and kissing them on

1    the cheek.  They said that he would call the girls over to him

2    and place them on his lap.

3           He was also observed laying on the floor and calling

4    little girls during naptime, calling them off their mats and

5    instructing them to crawl across him.  The employee also

6    stated that some of the children told him they were not

7    supposed to -- they were told not to hug strangers, so they

8    wouldn't do it, and so he wouldn't call those children back to

9    him.  It was just the others that did respond.

10   **Q**   And you mentioned CP charges in Germany.  Was there

11   anything in particular about those CP charges?

12   **A**   He was prosecuted for the child pornography charges

13   there.  And also that would go consistent -- corroborate what

14   the victim stated in her interview about Mr. Rick showing her

15   movies with naked boys and naked girls in it, which in my

16   experience in investigations, it kind of goes along with the

17   way offenders use the child pornography to groom victims to

18   perform the assault.

19   **Q**   Do you know if Germany investigated these allegations?

20   **A**   Yes, they did.  They determined that since the victim was

21   already in the United States and that all they had was the

22   video of the --

23           MR. BURGESS:  Your Honor, I'm going to object.  That

24   determination would be in writing.  And if he is referring to

25   a writing, I would ask for a copy of that.

1          THE COURT:  Is there a document?

2          MS. HUTZELL:  There is a document, Your Honor.  I do

3    not have it here with me, but the defense had access to look

4    at those on Thursday, to come over.

5          MR. BURGESS:  And that's the reason I'm asking for

6    it, because I'll represent to the Court that that is not what

7    it represents.

8          THE COURT:  So you had an opportunity to review the

9    document?

10         MR. BURGESS:  We've had an opportunity to review

11   some documents, and there was a document that said, to the

12   best of my recollection, the German officials were not going

13   to pursue the matter because of basically inconsistencies in

14   the child's story.

15         THE COURT:  Well, Mr. Burgess, wouldn't that

16   properly be the subject of cross-examination?

17         MR. BURGESS:  Well, it would, but he testified -- I

18   don't have the document because the Government is asking for a

19   protective order.  But if he is going to testify to it, then I

20   need the document to perhaps impeach him with it.

21         THE COURT:  And you don't have the document here?

22         MS. HUTZELL:  I do not have the document here.

23         THE COURT:  And you do not have the document?

24         THE WITNESS:  No, ma'am.

25         THE COURT:  Mr. Burgess, why don't we proceed and at

1  the time of cross-examination if you think that you need the

2  documents, raise it with the Court at that time.

3       MR. BURGESS:  Yes, Your Honor.

4  **BY MS. HUTZELL:**

5  **Q**   Agent Salser, would you like to continue, or were you

6  finished?

7  **A**   I forgot where we were, to be honest with you.

8  **Q**   We were talking about whether or not Germany investigated

9  the allegations.

10  **A**   Oh, yes, ma'am.  The German authorities decided not to

11  pursue charges against the defendant because the victim was

12  living in the United States at that time and they had, for

13  lack of a better term, an expert there look at the video and

14  they determined that without being able to interview the

15  victim in person, that they didn't want to pursue charges.

16       They had also -- "expert," I think, was the term

17  they used, did show that there were inconsistencies in the

18  video but also pointed out that that is consistent with

19  children of that age, that they are inconsistent.  The victim

20  pointed out -- she did name some other children during her

21  disclosure.  One was determined to be a make-believe friend

22  and some of the other children that were interviewed, they did

23  not disclose anything, that they were actually real children.

24  **Q**   Let's move on to the defendant's employment.  What do you

25  know about the defendant's current employment?

1  **A**    That he is a truck driver.

2  **Q**    Do you know where the defendant was arrested?

3  **A**    Yes, ma'am.  He was arrested in Georgia and it took

4  them -- I think it was approximately three weeks to locate him

5  before they took him into custody.

6  **Q**    Do you know where the defendant's employment as a truck

7  driver takes him, what his routes are?

8  **A**    Numerous locations.  I know as far as Texas, but I'm not

9  sure of all the locations.  But like I said, as far as Texas.

10  **Q**    Have you spoken to the victim's family?

11  **A**    Yes, ma'am.

12  **Q**    What did they tell you?

13  **A**    They had --

14         MR. BURGESS:  Objection.

15         THE COURT:  On what grounds?

16         MR. BURGESS:  Can I take the witness on voir dire

17  for a second?

18         THE COURT:  You may.

19                         **VOIR DIRE**

20  **BY MR. BURGESS:**

21  **Q**    The victim's family, when is the last time they've said

22  they've had any contact with this man?

23  **A**    I didn't ask them.

24  **Q**    So do you know of any contact that he has had with them

25  since he returned to the United States in 2010?

1     **A**    I'm not aware.  I don't know.

2          MR. BURGESS:  If they are not here to testify

3     against something, I don't know what we can allow, as far as

4     talking to the victim's family, except maybe their desire or

5     wish about the defendant's detention, and I don't think that's

6     a proper consideration under the Bail Reform Act.

7          THE COURT:  I will sustain.

8          MS. HUTZELL:  Your Honor, what I was going to ask

9     Agent Salser is:  The family had submitted a letter that they

10    would like to be read to the Court, if Your Honor would like.

11    I've already given the defense a copy.  Would you like a copy?

12    I was going to ask the agent to read it.

13          THE COURT:  Mr. Burgess?

14          MR. BURGESS:  And that's what I think is improper.

15    It's not a proper consideration under the Bail Reform Act and

16    does not go to, I imagine, the two prongs that the Government

17    is proceeding on in this case.

18          THE COURT:  Ms. Hutzell, is it your position that

19    there's anything of relevance to the issue of detention in

20    that letter?

21          MS. HUTZELL:  Your Honor, pursuant to 18 U.S.C.

22    3771, a crime victim has the right to be reasonably heard at

23    any public hearing, which includes detention, and because the

24    family is on active military duty, they submitted this letter.

25          THE COURT:  If there is something specific that's

1   relevant to the issue of detention, I will allow you to ask

2   the witness about that, but I'm not going to accept that into

3   evidence as a document.  It needs to be relevant to the issue

4   of detention.

5            MS. HUTZELL:  The letter is written specifically for

6   the detention hearing, relevant to detention.  Would you like

7   to review the letter?

8            THE COURT:  No.  Again, if there is something in

9   there that addresses specifically risk of flight,

10  dangerousness to the community, something that's relevant to

11  the issues that are before the Court with respect to

12  detention, I will allow you to ask the witness about it, but

13  I'm not going to allow the letter in as an exhibit, just the

14  entire letter.

15           MS. HUTZELL:  The letter does go to the danger to

16  the community.

17           MR. BURGESS:  It goes to their fears, but that's why

18  I asked the witness on voir dire about any contact he has had

19  with them.  Just their wanting him not out is not a prong

20  under the Bail Reform Act.

21           THE COURT:  Ms. Hutzell, if you will ask a question,

22  and if there's an objection, I will rule on it.

23                  **DIRECT EXAMINATION (resumed)**

24  **BY MS. HUTZELL:**

25  **Q**   Agent Salser, just to clarify, you spoke with the

1   victim's family?

2   **A**    Yes, ma'am.

3   **Q**    When was that?

4   **A**    This afternoon around 12:30, 12:15, 12:30, something like

5   that.

6   **Q**    Agent Salser, did the family indicate to you that they

7   had any concerns about the defendant, any attempt to harass or

8   contact them in any way?

9   **A**    Yes, ma'am.

10          MR. BURGESS:  Objection.

11          THE COURT:  Overruled.

12  **Q**    What did they tell you?

13          MR. BURGESS:  Objection.

14          THE COURT:  Overruled.

15  **A**    They stated that they were concerned about -- well,

16  mainly due to his job, him being able to travel, that he would

17  be able to locate their family.

18          MS. HUTZELL:  Your Honor, there's nothing further at

19  this time.

20          THE COURT:  Mr. Burgess?

21          MR. BURGESS:  Yes, ma'am.

22                        <u>**CROSS-EXAMINATION**</u>

23  <u>**BY MR. BURGESS:**</u>

24  **Q**    Agent Salser, are you the case agent?

25  **A**    No, sir.

**Q**   Did you testify to the grand jury?

**A**   No, sir.

**Q**   So you don't know what the grand jury was told or not told?

**A**   Excuse me?  What they were told, no.

**Q**   And you said that you were familiar with the indictment in the case?

**A**   Yes.

**Q**   The allegations regarding the child that are the subject of the indictment, those allegations occurred, did they not, from May of 2007 to December 2008; right?

**A**   I think that's correct.

**Q**   And that was before the time that the defendant worked at the Child Development Center; right?

**A**   I'm not sure.

**Q**   Well --

**A**   I'm sorry.  Are you saying that the assault itself took place during that time?

**Q**   I'm saying the alleged assault --

**A**   Alleged assault, excuse me.

**Q**   -- occurred, that what the Government has alleged, they are saying it occurred between May of 2007 and December of 2008?

**A**   Okay.

**Q**   That was before he went to work at the Child Development

1    Center in Heidelberg in July of 2009; right?

2    **A**    I believe so.

3    **Q**    And there's no allegations regarding the alleged victim

4    in this case being connected with him being employed at the

5    Development Center, is there?

6    **A**    Not that I'm aware of.

7    **Q**    Do you know why that's included in the indictment, the

8    fact that he just worked there?

9    **A**    Because of the inappropriate activity that took place

10   there.

11   **Q**    Regarding the victim in this case?

12   **A**    No, sir.

13   **Q**    So tell me why that's in the indictment, again.

14   **A**    I don't know.

15   **Q**    And I believe you testified that the parents of this

16   child left her with Mr. and Mrs. Evans because they were being

17   deployed?

18   **A**    Correct.

19   **Q**    Well, wasn't the child's mother a single parent at that

20   time?

21   **A**    I'm not aware.  I don't know.

22   **Q**    Do you know if she was married or not?

23   **A**    I don't know.

24   **Q**    And so there was some reported statements made when the

25   child gets to Alabama in July of 2009; is that correct --

1    **A**    Yes.

2    **Q**    -- over instances that, if they occurred, would have

3    ended in December of 2008, according to the indictment; right?

4    **A**    I'm not really sure of the dates off the top of my head.

5    **Q**    How many people talked to this child about these

6    allegations prior to the grandmother seeking any professional

7    help?

8    **A**    I'm not sure.

9    **Q**    Nobody has ever asked the grandmother that?

10   **A**    I'm not aware.

11   **Q**    Does your file indicate that?

12   **A**    I don't have my file with me.

13   **Q**    Do you know what's in your file?

14   **A**    I'm not the case agent.

15   **Q**    Well, to your knowledge, how many people talked to this

16   child prior to the grandmother seeking some professional

17   consultation in 2009?

18   **A**    I don't know.

19   **Q**    Who is the case agent on this case?

20   **A**    Agent Childers.

21   **Q**    Agent Childers?

22   **A**    Yes.

23   **Q**    Is he in court?

24   **A**    Yes, sir.

25   **Q**    So at some point the grandmother had or somebody set this

1   child in front of some forensic examiner?

2   **A**   Not a forensic examiner.  It was the Child Advocacy

3   Center, not a forensic examiner.

4   **Q**   Do they have any expertise in doing this?

5   **A**   Possibly a forensic interviewer, but not an examiner.

6   **Q**   Well, an forensic interviewer.  Did they put her in front

7   of the forensic interviewer?

8   **A**   Yes.

9   **Q**   Did they record it?

10  **A**   Yes.

11  **Q**   Do you know how many forensic interviews had been done to

12  this child?

13  **A**   No, I do not.

14  **Q**   Did they videotape that?

15  **A**   Yes.

16  **Q**   Is that the videotape that was sent back to Germany?

17  **A**   To my knowledge, yes.

18  **Q**   Do you know if any forensic interviews took place in

19  Germany?

20  **A**   Not that I'm aware of.

21  **Q**   Isn't it a fact that Germany decided not to pursue the

22  allegations because, included among the reasons, is that the

23  child gave inconsistent stories?

24  **A**   That was among the reasons, yes.

25  **Q**   And that the child was saying things and describing

1  things that were clearly fantasy?

2  **A**   They were inconsistent like most children are at that

3  age.

4  **Q**   Right, but didn't they talk about fantasies?

5  **A**   Correct.  She did mention a make-believe friend, yes.

6  **Q**   And make-believe people who were doing things to her or

7  having things done to them; right?

8  **A**   I'm not aware of that.

9  **Q**   And the German Police Department consulted with their own

10  expert and had them review that tape, did they not?

11  **A**   Yes, that's my understanding.

12  **Q**   Isn't part of the reason they decided not to pursue the

13  case because their experts said that using forensic and

14  scientific standards, that basically, to phrase it a better

15  way, the child's story just didn't hold water?

16  **A**   They cited inconsistency and the fact that they could not

17  interview the child in person.

18  **Q**   And you said the child mentioned some other children that

19  were either make-believe or actual children; right?

20  **A**   Correct.

21  **Q**   You're aware that the German Police interviewed the kids

22  that she named; right?

23  **A**   I'm not aware of that.

24  **Q**   You didn't read that in the file?

25  **A**   I don't recall.

1  **Q**    You didn't read that those two children that they

2  interviewed did not substantiate any sexual, inappropriate

3  activity?

4  **A**    I know other children were interviewed and they did not

5  disclose.  I cannot recall who interviewed them.

6  **Q**    Was there a medical exam done of the child?

7  **A**    Yes, there was.

8  **Q**    When was that done?

9  **A**    After the allegations were made.  I don't know the dates.

10  **Q**    What did the medical exam show?

11  **A**    It was inconclusive.  They did not discover anything.

12  **Q**    It showed no evidence of sexual abuse whatsoever; right?

13  **A**    Right.  No, it did not.

14  **Q**    And wasn't that performed at Children's Hospital here?

15  **A**    Yes, I believe it was.

16  **Q**    There were DNA tests done also, weren't there?

17        MS. HUTZELL:  Objection, Your Honor.  What is the

18  relevance to the detention hearing?

19        MR. BURGESS:  Because you have to evaluate the

20  strength of their case in deciding whether or not this man is

21  going to be eligible for a bond, Your Honor, and these alleged

22  acts occurred almost five, six years ago, and not only have

23  prosecutions been dropped, other prosecutors have, I would

24  say, not been diligent in pursuing the case, and I think that

25  all goes to the issue of whether or not you think the man can

1    be released on bond.

2            THE COURT:  I will allow it.

3    **BY MR. BURGESS:**

4    **Q**    So there was DNA done; right?

5    **A**    I believe so, yes.

6    **Q**    What were the results of that?

7    **A**    I believe it was negative.

8            THE COURT:  Just so I'm clear, DNA tests on what?

9    **Q**    There were DNA tests done on the sex toys that the child

10   allegedly said she had been touched with; right?

11   **A**    There was, for lack of a better term, an exam done on the

12   victim to see if there was any evidence showing of there being

13   penetration or anything like that, is my understanding.

14   **Q**    That was the medical exam.  I'm talking about a separate

15   testing, DNA testing.

16   **A**    I'm sorry.  I didn't understand that question.  I thought

17   you were still on the medical exam.  As far as DNA exam, I

18   don't recall.  I thought we were still in the medical exam

19   part of it.

20   **Q**    Well, now do you recall the DNA?

21   **A**    No, I don't.

22           THE COURT:  Just so the Court is clear, with respect

23   to DNA testing, when a medical exam was conducted on the

24   child, was there any DNA evidence found?

25           THE WITNESS:  Not that I'm aware of, ma'am.  But a

specific DNA test done on the child, I'm not aware if there

was or not.  To my knowledge, there was not anything found

showing there was, like I said, any -- there was no bodily or

physical evidence there.

**BY MR. BURGESS:**

**Q**    Are you aware that Mr. Evans voluntarily gave a sample of

his DNA?

**A**    No, I was not.

**Q**    Are you aware that DNA tests were performed on the sex

toys?

**A**    I was not aware of that.

**Q**    Are you aware that Mr. Evans voluntarily stayed in

Germany during the period of time that the German Police

Department was investigating this case?

**A**    No, I was not.

**Q**    Were you aware that he didn't leave until the Germans

told him he was free to leave?

**A**    I knew that he was prosecuted there for the child

pornography.

**Q**    That's not what I'm asking.

**A**    He left.  I don't know at what time he left after that.

**Q**    This, as you call it, child pornography, that was a fine,

wasn't it?

**A**    Yes, that was the punishment there, I believe.  It winded

up being a fine.

1   **Q**   And whatever images there were or may have been were

2   destroyed; right?

3   **A**   I'm not sure.  I don't know.

4   **Q**   Are you aware that CID represented to Mr. Evans that --

5   Army CID, that as far as they were concerned, he was free to

6   leave Germany also?

7   **A**   I was not aware of that.

8   **Q**   Do you know when he left Germany?

9   **A**   I don't recall.

10  **Q**   Was it sometime around 2010?

11  **A**   That's possible.  I don't recall the date.

12  **Q**   You're not aware that they said that they basically

13  stopped pursuing it because of lack of evidence and

14  inconsistency in the evidence?

15  **A**   I was not aware of that.

16  **Q**   Well, Mr. Evans has been working for the same company, by

17  the way -- let me just do this.

18          MR. BURGESS:  You have the pretrial services report,

19  I think?

20          THE COURT:  I do.

21          MR. BURGESS:  We need to make a factual correction

22  to that under his employment.  He has been employed since 2012

23  at that trucking company, not 2014.  So it's about two years.

24          THE COURT:  Instead of two months?

25          MR. BURGESS:  Right.

1   **BY MR. BURGESS:**

2   **Q**   So are you aware that Mr. Evans has been working for the

3   same company for the last two years?

4   **A**   I was not.

5   **Q**   Working under his name, under his Social Security number.

6   Are you aware of that?

7   **A**   Yes.

8   **Q**   He filed taxes for the last two years.  Are you aware of

9   that?

10  **A**   Yes.

11  **Q**   That doesn't sound like somebody who is trying to hide

12  out to avoid any law enforcement people, does it?

13          MS. HUTZELL:  Objection, Your Honor.  How is that a

14  question for Agent Salser?

15          THE COURT:  Overruled.  Go ahead.

16  **Q**   I think you may have been asked earlier about some

17  difficulty in locating him.  As a law enforcement agent, did

18  you run any of those databases, Social Security number, dates

19  of birth, employment records, where it would have shown where

20  he was?

21  **A**   I wasn't involved in the actual arrest.

22          MR. BURGESS:  That's all I have for this witness

23  right now.

24          THE COURT:  Ms. Hutzell, anything further?

25          MS. HUTZELL:  Yes, just a few questions, Your Honor.

1          **REDIRECT EXAMINATION**

2 **BY MS. HUTZELL:**

3 **Q**    Agent Salser, you talked a little bit about the medical

4 exam.  Did the medical examiner note whether or not it was

5 normal to find no evidence of sexual abuse, even if there was

6 sexual abuse?

7 **A**    Because of the amount of time that had passed, they

8 pointed out that it probably wouldn't be conclusive.

9 **Q**    And did the victim disclose any penetration?

10 **A**    Not that I'm aware of.  Other than -- well, let me

11 correct that.  With hands, yes, but with toys -- I believe

12 that was all.  As far as intercourse, I don't believe there

13 was any.

14 **Q**    And the sex toy, you said that the victim described it.

15 What was the name of that?

16 **A**    The ice man.

17 **Q**    And was the name of that confirmed by anyone?

18 **A**    Yes, his ex-wife.  It was also located in a storage unit

19 here in Anniston where they had shipped stuff over, and it was

20 obtained there.  It stayed in a storage lock-up for a pretty

21 lengthy period of time, I believe.

22 **Q**    The expert in Germany, did the expert in Germany make any

23 findings of sexual abuse based on the forensic interview she

24 watched?

25 **A**    I don't recall.

1          MS. HUTZELL:  Nothing further, Your Honor.

2          THE COURT:  Mr. Burgess?

3                    **RECROSS-EXAMINATION**

4    **BY MR. BURGESS:**

5    **Q**    You said that there was penetration with hands and toys?

6    **A**    I believe that's correct.

7    **Q**    But the medical people found no evidence of any

8    penetration right, no medical evidence?

9    **A**    Right, because of the amount of time that had passed,

10   they did not.

11   **Q**    If there had been physical penetration, there would have

12   been some medical exam evidence to show that that would not

13   have anything to do with the passage of time, wouldn't there?

14          MS. HUTZELL:  Objection, Your Honor.  This witness

15   can't testify to that.

16          THE COURT:  You can answer the question.

17   **A**    I'm not a medical personnel, so I wouldn't know.

18   **Q**    But you have investigated lots of child abuse cases,

19   haven't you?

20   **A**    Yes.

21   **Q**    And usually if there has been penetration, the child's

22   hymen is not intact; correct?

23   **A**    I wouldn't know.

24   **Q**    You don't know that from experience?

25   **A**    No, sir.

1  **Q**    But the child's hymen was intact in this case?

2  **A**    I don't know.

3  **Q**    And you say the wife basically corroborated the name of

4  this sex toy; right?

5  **A**    Correct.

6  **Q**    Or ex-wife.  So I guess Mr. Evans and her aren't getting

7  along.  They are separated; right?

8  **A**    Yes, I guess.

9  **Q**    She corroborated the name of the sex toy; right?

10  **A**    Correct.

11  **Q**    But she also said no one touched this child

12  inappropriately, didn't she?

13  **A**    I believe that was her statement, to her knowledge.

14  **Q**    To your knowledge.  She was the primary caretaker, wasn't

15  she?

16  **A**    I believe.  That was the statement she made.

17              MR. BURGESS:  That's all I have, Your Honor.

18              THE COURT:  Ms. Hutzell, anything further?

19              MS. HUTZELL:  Nothing further for this witness, Your

20  Honor.

21              THE COURT:  Agent Salser, when did the disclosure

22  initially occur by the child?

23              THE WITNESS:  Date-wise, I'm not sure Your Honor.  I

24  think it was around 2007, 2008.

25              THE COURT:  When the disclosure took place or when

1    the events took place?

2          THE WITNESS:  The disclosure, I believe she had been

3    back -- I don't know the date, Your Honor, but I think she had

4    been back in the United States like a year or something like

5    that.

6          THE COURT:  And how is it that the charge of

7    possession of child pornography arose?  Did it come about

8    after the disclosure by the child?

9          THE WITNESS:  No, ma'am.  That was when -- the

10   German authorities discovered that, and then he was still

11   living in Germany at the time, and then they -- I really don't

12   know how they -- let me back up.  I'm not sure exactly how

13   they came to the charges.  They executed the search warrant,

14   but they discovered the child pornography during the execution

15   of the warrant in Germany.

16         THE COURT:  There was a search warrant that was

17   executed prior to a disclosure by the child victim in this

18   case?

19         THE WITNESS:  I'm not sure about that, Your Honor,

20   the sequence there.

21         MR. BURGESS:  If we may, I think we can be in

22   agreement that that search warrant and computer search and

23   search of his residence and other things occurred after the

24   disclosure by the child in July of 2009, approximately.

25         THE COURT:  All right.  So the search warrant was

1   based on the child's disclosure?

2           MR. BURGESS:  Yes, sir.

3           MS. HUTZELL:  Yes, sir.

4           THE COURT:  And the search warrant was executed in

5   his home in Germany?

6           MR. BURGESS:  Yes, sir.

7           THE COURT:  Where was the child porn found?  Can

8   anybody address to the Court what the nature of the child porn

9   was, the volume?

10          MR. BURGESS:  And we're not submitting that it

11  would -- or admitting that it would meet the definitions of

12  child porn, I don't know, at least in this country.  But from

13  what I understand, whatever there was is gone.

14          THE COURT:  Does anybody know what there was?

15          MS. HUTZELL:  Your Honor, I have a list of what it

16  was back at the office, but I do know that there was a -- at

17  least one media was full of child pornography.  There were

18  several images and videos found.

19          THE COURT:  On his computer?

20          MS. HUTZELL:  It was either on his computer or it

21  may have been on a USB drive that was on his personal

22  computer.

23          MR. BURGESS:  To the extent this also helps, Your

24  Honor -- again, I'm not conceding what was there was child

25  porn.  Like I say, I think it has been destroyed.  But there

1  is a statement in what I looked at that said whatever was

2  there was not images of this child.

3  　　　　　MS. HUTZELL:  Correct.

4  　　　　　THE COURT:  But they were allegedly children?

5  　　　　　MS. HUTZELL:  Yes, Your Honor.

6  　　　　　THE COURT:  Does anybody know anything more about

7  the images?

8  　　　　　MS. HUTZELL:  From the descriptions that I've read,

9  it would be considered child porn here.  It was boys and girls

10 and they were nude, in various acts, both video and images,

11 and there were significant numbers.  It wasn't just a few of

12 them.  One media was completely full of them.

13 　　　　　THE COURT:  And was Mr. Evans convicted?

14 　　　　　MS. HUTZELL:  Yes.

15 　　　　　MR. BURGESS:  He incurred a fine.

16 　　　　　THE COURT:  Does anyone have anything further for

17 Agent Salser?

18 　　　　　MS. HUTZELL:  No, Your Honor.

19 　　　　　THE COURT:  You may step down.  Thank you.

20 　　　　　Ms. Hutzell, do you have any other witnesses?

21 　　　　　MS. HUTZELL:  Your Honor, we would like to proffer

22 the pretrial services report with the corrections that

23 Mr. Burgess made at this time.

24 　　　　　THE COURT:  Anything further on behalf of the

25 Government?

1          MS. HUTZELL:  Nothing else, Your Honor.

2          THE COURT:  Thank you.  Mr. Burgess, just with

3     respect to the pretrial services report, to make sure I'm

4     clear, is the only correction the one that you noted about the

5     length of his employment?

6          MR. BURGESS:  Well, on the first page, under the box

7     that has "defendant" written above it under the address, two

8     years in that box for employment instead of two months and

9     then on page 2 there's the same thing about being there two

10    months, and they've got since October of 2014.  It should be

11    October of 2012.

12         THE COURT:  But that correction in multiple places

13    with respect to his employment is the only substantive change?

14         MR. BURGESS:  Right, Your Honor.

15         THE COURT:  And I interrupted you.  I apologize.  Go

16    ahead.

17         MR. BURGESS:  We would just, since we're dealing

18    with this report, proffer that he does have ties to Alabama.

19    He graduated from high school in Anniston.  He is a child

20    whose father was in the military, so obviously he moved

21    around, but as the indictment claims, his address being in

22    Alabama and, like I say, he has been back at least in this

23    area, in the Talladega area, at least since 2012 and he is --

24    or 2011, I believe.  And he does have -- while they are not

25    relatives, he has a strong relationship with a female and good

1  relationship with her family, and they are here to support

2  him.

3          THE COURT:  When did Mr. Evans return from Germany?

4          MR. BURGESS:  November 20, 2011.

5          THE COURT:  And he has been in the Talladega area

6  since that time?

7          MR. BURGESS:  His mother passed away, I think, in

8  June of 2012 and she lived up in the Calhoun County, I think,

9  in the Saks area, so he was up there helping her.  And then

10  after she died, he went to Talladega.

11          THE COURT:  Since returning from Germany in November

12  2011, he has been in the Northern District of Alabama?

13          MR. BURGESS:  Yes, ma'am.  Your Honor, we're going

14  to offer a third-party custodian, Carroll Wilson, please.

15                        **CARROLL WILSON,**

16  called as a witness by the defendant, after having been sworn

17  to speak the truth, testified as follows:

18                     **DIRECT EXAMINATION**

19  **BY MR. BURGESS:**

20  **Q**    Mr. Wilson, where do you live?

21  **A**    I live at 1420 County Park Lane, Talladega.

22  **Q**    Is that a house or an apartment or what?

23  **A**    It's a three-bedroom home.

24  **Q**    Do you own that home?

25  **A**    Yes, I do.

1  **Q**    You're not a relative of Mr. Evans, are you?

2  **A**    No.

3  **Q**    But you are the uncle of the lady that he has been in a

4  serious relationship with for the last two years or so; right?

5  **A**    Yes.

6  **Q**    And so you have known Mr. Evans for the last two years?

7  **A**    Yes.

8  **Q**    How old are you?

9  **A**    58.

10  **Q**    And do you work anywhere?

11  **A**    No.  I'm disabled.

12  **Q**    What is the nature of your disability?

13  **A**    Back pain.

14  **Q**    Was that an on-the-job injury?

15  **A**    Yes.

16  **Q**    What type job did you do prior to becoming disabled?

17  **A**    I was an RN.

18  **Q**    So you have known Mr. Evans now for a good two years,

19  basically?

20  **A**    Yes.

21  **Q**    Let me ask you this.  Do you have Internet connection to

22  your house?

23  **A**    No.

24  **Q**    And you said it was a three-bedroom house?

25  **A**    Yes.

1   **Q**    Who else lives there?

2   **A**    Just myself.

3   **Q**    I believe back in '94, when I checked AlaCourt records,

4   it looks like back in '94 you had a traffic case for speeding

5   and eluding a police officer; right?

6   **A**    Yes.

7   **Q**    And you pled guilty to that?

8   **A**    Yes.

9   **Q**    And if I read AlaCourt correctly, that appears to be a

10  misdemeanor; is that right?

11  **A**    As far as I know.

12  **Q**    Do you have any other convictions?

13  **A**    No.

14  **Q**    You heard this testimony today; right?

15  **A**    Yes.

16  **Q**    You realize these are some serious charges against

17  Mr. Evans?

18  **A**    Yes.

19  **Q**    But you discussed with our office what it means to be a

20  third-party custodian for the Court, have you not?

21  **A**    Yes.

22  **Q**    Was it explained to you that if the Judge releases

23  Mr. Evans, she will put down certain rules about things he can

24  and can't do?

25  **A**    Yes.

1    **Q**    As a third-party custodian, you would have to report him

2    immediately if he didn't do what he is supposed to do; right?

3    **A**    Yes.

4    **Q**    You understand you could go to jail if you failed to

5    report him?

6    **A**    Yes.

7    **Q**    Are you still willing to be a third-party custodian for

8    him, let him live at your house?

9    **A**    Yes.

10          MR. BURGESS:  That's all I have, Your Honor.

11          THE COURT:  Ms. Hutzell?

12                      **CROSS-EXAMINATION**

13   **BY MS. HUTZELL:**

14   **Q**    Mr. Wilson, you said you are Angela Kavender's uncle?

15   **A**    Yes.

16   **Q**    Are you and she close?

17   **A**    Yes.

18   **Q**    How long did you say you have known the defendant, two

19   years?

20   **A**    Yes.

21   **Q**    Does Angela Kavender have any children?

22   **A**    Yes.

23   **Q**    How many children does she have?

24   **A**    Two.

25   **Q**    How old are they?

| | | |
|---|---|---|
| 1 | **A** | One is 13 and one is 9. |
| 2 | **Q** | Are those girls or boys? |
| 3 | **A** | The oldest is a boy and the youngest is a girl. |
| 4 | **Q** | So the girl is 9 years old? |
| 5 | **A** | Yes. |
| 6 | **Q** | How close does she live to your house? |
| 7 | **A** | I would say about 1,000 feet. |
| 8 | **Q** | So in the neighborhood, pretty close? |
| 9 | **A** | Yes. |
| 10 | **Q** | Does the defendant currently live with Angela Kavender? |
| 11 | **A** | He lived with her when he wasn't on the road. |
| 12 | **Q** | And that was with the two children? |
| 13 | **A** | Yes. |
| 14 | **Q** | He travels a lot for work? |
| 15 | **A** | Yes. |
| 16 | **Q** | Do you know if he has a passport? |
| 17 | **A** | I have no idea. |

18         MS. HUTZELL:  Nothing further, Your Honor.

19         THE COURT:  Mr. Burgess?

20                    **REDIRECT EXAMINATION**

21 **BY MR. BURGESS:**

22 **Q**    If the Court places restrictions on Mr. Evans about being

23 around any minors, including your niece's children, are you

24 willing to make sure that he complies with that?

25 **A**    Yes.

1   **Q**     You and others were asked about him being a truck driver.

2   If the Court decides that one of the ways that they would let

3   him out is that he would be on an ankle monitor where he is

4   not allowed to go out trucking, in essence, he's locked down

5   at your house 24/7 except for court appearances and meeting

6   with lawyers, et cetera, can you enforce that?

7   **A**     Like going to the grocery store and to my doctor when I

8   have to go?

9   **Q**     Right, that he might have to accompany you, would you

10   still be willing to do that?

11   **A**     Yes.

12           MR. BURGESS:  That's all I have, Your Honor.

13           THE COURT:  Ms. Hutzell?

14           MS. HUTZELL:  Nothing further, Your Honor.

15           THE COURT:  You may step down, Mr. Wilson.

16           Anything further, Mr. Burgess?

17           MR. BURGESS:  No, Your Honor.

18           THE COURT:  Ms. Hutzell, anything further on behalf

19   of the Government?

20           MS. HUTZELL:  No, Your Honor.  I would just like to

21   point out our objection to this third-party custodian.  The

22   fact that he lives 1,000 feet from the defendant's fiance's

23   children I think is reason enough that he should not be a

24   third-party custodian, and I think that in this case that with

25   the risk of flight, with the danger to the community, and with

1    the presumption in this case, that the defendant should be

2    detained.

3             THE COURT:  Mr. Burgess?

4             MR. BURGESS:  The presumption is a rebuttable

5    presumption and all we have to do is come up with some

6    evidence, which I think we have, with the totality of the

7    testimony, plus our third-party custodian, and then the burden

8    of persuasion goes back to the Government.

9             Your Honor, we've got a case with acts that they

10   allege occurred in 2007, 2008.  Two law enforcement agencies,

11   the German Police, Army CID, investigated it.  The German

12   Police decided not to prosecute based in part on the forensic

13   evidence or interview that was done here.  The child gave

14   inconsistent stories, said stuff that was obviously fantasy.

15   But during that entire time, Mr. Evans voluntarily stayed in

16   Germany under their jurisdiction until both CID and German

17   Police said you are free to go.  That was in 2010, 2011.

18            He cooperated.  He gave a statement.  He hasn't

19   tried to run and hide from anybody.  He has known about this

20   since 2009 and hasn't tried to flee any jurisdictions, hide

21   his identity, do anything.

22            He has got a place to go with somebody that will

23   take him in.  You can put him on a monitor.  You can lock him

24   down.  I understand completely that you don't want him driving

25   a truck around the country.  But like I say, if he wanted to

1    hide or do whatever, he has had four years to do it.  He

2    hasn't done it.

3          There's no medical evidence supporting this.

4    There's no DNA supporting it.  You've got a child who I would

5    suspect has been repeatedly questioned about something.  And

6    with each questioning, the integrity of the story lessens

7    because you run the risk of false memories, et cetera, but the

8    one that was closest to the incident was -- like I say, it was

9    fantasy, inconsistency.

10          So, Your Honor, looking at all those facts and the

11    timetable that we've been involved with, I think it's an

12    unusual case but I also think it's an unusual case that you

13    should set a bond for him because of some of those unusual

14    things.

15          And we would ask that there be a third party, 24/7

16    lockdown except for the usual and necessary things,

17    restrictions on contact with minors, no guns, no Internet

18    access, no contact with any witnesses.

19          I think with all that, we have met and defeated that

20    presumption, that rebuttable presumption, and we would ask

21    that you set those.

22          THE COURT:  I'm going to take a short recess.  I

23    have something else scheduled.  I'm seeing some folks in

24    chambers, and I'm going to give this some further thought.  So

25    it will probably be about 15 or 20 minutes.

1           (Recess at 3:45 p.m.)

2           (Back in open court at 4:20 p.m.)

3           THE COURT:  Mr. Evans, this is a very serious

4      decision before the Court and I do not want to be rushed in

5      making a decision.  It is serious and weighty.

6           I will say that I am not satisfied at this point

7      that the combination of conditions that have been proposed are

8      sufficient to alleviate the concerns that I have of the risk

9      that you would pose if you were released.

10          Mr. Burgess, it might be that a secured bond would

11     be sufficient.  I'm not saying that it is, but it might be.  I

12     want to give everything further consideration.  But I would

13     ask that you talk to Mr. Wilson about that or any -- I don't

14     know if there is any family in the community at all or if it's

15     simply Ms. Kavender's family.

16          MR. BURGESS:  His father is retired from the

17     military, Your Honor, but he lives, I think, in Texas, and his

18     mother is deceased.  His sister is deceased.  We were looking

19     for local people.

20          THE COURT:  What I'm going to do is take it under

21     advisement and give you the opportunity to explore that

22     possibility, and you can coordinate with Mr. Fuentes or

23     someone else in the probation office to see if that is an

24     option.

25          MR. BURGESS:  Would that be in connection with the

1    third-party I would assume?

2         THE COURT:  Yes, most definitely.  So that's what

3    I'm going to do.  I'm going to take it under advisement and

4    give it further consideration and ask that you look into that

5    as a possibility and report back to the Court with respect to

6    whether or not there's property that can be posted to secure

7    the bond.

8         MR. BURGESS:  Yes, Your Honor.

9         THE COURT:  Anything further at this time from the

10   Government?

11        MS. HUTZELL:  No, Your Honor.

12        THE COURT:  Mr. Burgess, anything further on behalf

13   of Mr. Evans?

14        MR. BURGESS:  Other than just alerting the Court

15   that we will be filing a motion to declare the case complex

16   for a lot of reasons, but we've got potential witnesses and/or

17   people that need to be talked to in Germany.  We've got

18   documents in German.  We've got people apparently in other

19   states.  And I just anticipate that probably we would be

20   asking even for a first setting to probably be no sooner than

21   June.  I'm just saying.  I'll let you know.

22        THE COURT:  And I don't know whether that motion

23   will be taken up by me or Judge Ott since this case has been

24   assigned to him, but I will alert him to that and we will work

25   that out among us.

1          Was there also mention of a motion for protective
2    order?
3          MS. HUTZELL:  Yes, Your Honor and that should be
4    ready to be filed first thing in the morning, I believe.
5          THE COURT:  I was going to say I hadn't seen it if
6    it has been filed.
7          MS. HUTZELL:  Will that be before you, Your Honor,
8    or --
9          THE COURT:  I'm not sure about that.  It will
10   probably be Judge Ott on both of those matters, but he and I
11   will discuss that and work it out.  Anything else?
12         MR. BURGESS:  No, ma'am.
13         THE COURT:  Then, Mr. Evans, you are remanded to the
14   custody of the U.S. Marshal, and we are adjourned.
15              (End of proceedings.)
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T I O N

        I hereby certify that the foregoing transcript
in the above-styled cause is true and accurate.


            **Leah S. Turner, RMR, CRR**
          **Federal Official Court Reporter**