IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V.             ) | Case No.: 1:14-CR-333-AKK-JEO |
| ) | |
| RICK LEE EVANS          ) | |

**MR. EVANS' FOURTH MOTION TO DISMISS - LACK OF JURISDICTION**

Comes now, Mr. Rick Lee Evans, through undersigned counsel and pursuant to Fed. R. Crim. P. 12(b)(3), and moves this Court to dismiss the indictment under which he was charged in the instant case for lack of jurisdiction. Specifically, Mr. Evans challenges the statute by which this indictment seeks to establish this Court's subject matter jurisdiction over the alleged conduct, the Military Extraterritorial Jurisdiction Act of 2000, as unconstitutional.

**Introduction**

In 2000, Congress passed MEJA in response to a perceived "jurisdictional gap," by virtue of which certain offenses committed by non-members of the military might go unprosecuted because they were committed outside the territorial jurisdiction of the United States. "Congress enacted MEJA in response to a jurisdictional gap created by host nations' reluctance to prosecute crimes against Americans committed by civilians accompanying the Armed Forces outside the United States." *U.S. v. Arnt*, 474 F.3d 1159, 1161 (9th. Cir. 2007). "To close this gap, MEJA creates federal jurisdiction over those who commit felonies while 'accompanying the Armed Forces outside the United States.'" *Id*. The statue prohibits prosecution of a member of the Armed Forces unless they are no longer subject to the Military Code of Criminal Justice and

1

states that no prosecution may be commenced if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or someone acting on his behalf.  18 U.S.C. § 3261 (d), (b).

With the passing of the Military Extraterritorial Jurisdiction Act ("MEJA"), 18 U.S.C. § 3261, et. seq., Congress has attempted to expand federal criminal jurisdiction in ways never imagined by the Constitution.  As MEJA goes well beyond the enumerated powers of Congress, this statute must be found unconstitutional as applied to Mr. Evans.  If the Court determines that MEJA is not unconstitutional, then the Court should still find that it does not have subject matter jurisdiction because Mr. Evans' should have been subject to court-martial and because the decision by the government to decide the timing and venue of the prosecution is a violation of the separation-of-powers principle; the nondelegation doctrine; and the Due Process Clause of the Fifth Amendment.  Finally, the decision to "take back" jurisdiction" from Germany is not consistent with the purpose and meaning of MEJA, thereby negating jurisdiction.

## Case Background

From approximately May, 2007 through December, 2008, M.C. lived in Heidelberg, Germany with Susan and Rick Evans.  M.C.'s mother was deployed through most of that time.  While M.C. was able to see her stepfather and mother periodically throughout this time, she was primarily in the care of the Evans family.  During the majority of that time, Mr. Evans was employed by the U.S. Army.  Mr. Evans was released from active duty on June 28, 2008 but remained in the reserves until December 10, 2010.  Mr. Evans remained in Heidelberg through

November, 2011.

In late June/early July, 2009, J. Johnson, the stepgrandmother of M.C., reported that while M.C. was living with her, M.C. allegedly disclosed inappropriate sexual contact with Mr. Evans during her time in Germany. On or about July 7, 2009, M.C. was interviewed by the Children's Hospital and Prevention Services ("CHIPS Center") about the alleged offense. During this visit, a medical examination was conducted and determined to be "normal". Therefore, the medical examination could not confirm nor exclude the possibility of sexual abuse. On July 10, 2009, a Child Forensic Interview Specialist at Prescott House Child Advocacy Center conducted a video-recorded interview of M.C. wherein she alleged that Mr. Evans "taught her about sex" but did not provide any details about how this was done. Following the disclosure and the July, 2009 interview of M.C., German authorities, with the assistance of Army CID, began investigating the case. During the course of the investigation, authorities in both Germany and the United States conducted more than 20 interviews of Mr. Evans' co-workers, other children, parents of children with whom Mr. Evans came in contact, M.C.'s teachers and therapist in the United States, and many of M.C.'s relatives. Additionally, German authorities conducted a search on Mr. Evans' home while U.S. authorities conducted a search on Mr. Evans' storage unit located in Alabama. Based on evidence located in the storage unit in Alabama, U.S. authorities conducted DNA testing.

In November, 2009, M.C. was interviewed by Army CID. While M.C. again alleged that there was inappropriate sexual contact with Mr. Evans, M.C. provided multiple inconsistent statements. Following the November session, additional interviews were conducted with people that M.C. alleged either witnessed the alleged offense or other possible victims none of whom

confirmed any knowledge of the abuse. On May 19, 2010, a German Forensic Psychologist issued an opinion regarding the integrity of the interviews and the credibility of M.C. On May 25, 2010, the German prosecutor terminated the investigation into the sexual abuse of M.C. U.S. authorities continued to investigate the case through October, 2010. By October 7, 2010, it was clear that Germany would not reopen its investigation and forwarded their file to U.S. authorities. On December 10, 2010, Mr. Evans was released from the U.S. Reserves. On January 24, 2011, U.S. authorities contacted German authorities and requested the release of the proceedings in accordance with article VII(3)© NATO-Status of Forces Agreement (SOFA) so that U.S. authorities could assume jurisdiction under the Military Extraterritorial Jurisdiction Act. From information provided to the defense, it does not appear that any further investigation was conducted on this case. DOJ attorney Sarah Chang and AUSA Daniel Murdock did meet with M.C. on August 8, 2014 but that was presumably in preparation for testifying. On October 31, 2014, Mr. Evans was indicted in the Northern District of Alabama in a one count indictment, alleging that Mr. Evans violated 18 U.S.C. § 2241 - aggravated sexual abuse of a child.

**Argument**

**I.     MEJA is unconstitutional**

The federal government is one of enumerated powers. *See, e.g., McCulloch v. Maryland*, 405 L.Ed. 579 (1819). "The United States is entirely a creature of the Constitution. Its power and authority have no other source." *Reid v. Covert*, 354 U.S. 1, 5-6 (1956). This concept has been reaffirmed repeatedly by the Court over the last two centuries. *See, e.g.*, *U.S. v. Comstock*,

560 U.S. 126, 133-34 (2010); *Gonzales v. Raich*, 545 U.S. 1 (2005); *Ex parte Quin*, 317 U.S. 1, 26 (1942) ("Congress and the President, like the courts, possess no power not derived from the Constitution").  According to the legislative history, Congress determined that the power to enact MEJA was granted to it under Article I, section 8, cls. 10, 14, 16, and 18 of th U.S. Constitution. *See* H.R. Rep. No. 106-778, pt. 1 at 14 (2000).

Clauses 16 and 18 are inapplicable because clause 16 deals with Congress's power relating to the individual states' militias, and clause 18, commonly referred to as the Necessary and Proper Clause, merely amplifies the powers specifically enumerated.  *E.g.*, *Kinsella v. Singleton*, 361 U.S. 234, 247 (1960) (observing that the Necessary and Proper Clause "is not itself a grant of power, but a caveat that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing powers'").  Thus, if Congress had the authority to expand criminal jurisdiction as it purported to do in MEJA, such authority should be located either in clause 10 or clause 14 of Article I, section 8 of the Constitution.  *See* H.R. Rep. No. 106-778, pt. 1 at 14 (2000).

Clause 10 gives Congress the authority to "define and punish . . . offences against the law of nations."  U.S. Const. Art. I, sec. 8, cl. 10.  "[T]he law of nations governs actual interactions between countries, and by extension between their citizens, in discrete areas such as war, trade, navigation, and diplomacy."  Michael T. Morely, *The Law of Nations and the Offenses Clause of the Constitution: A Defense of Federalism*, 112 Yale L.J. 109, 118 (2002).  While case law involving the law of nations is limited, that which does exist supports is limited applicability. The Offenses Clause has been cited as the primary basis for legislation prohibiting picketing or protesting in the vicinity of embassies within the United States, *Boos v. Barry*, 485 U.S. 312, 316

5

(1988); legislation empowering Congress to establish military commissions to try violations of the law of war, *Ex parte Quirin*, 317 U.S. 1, 28-30 (1942); and legislation prohibiting the counterfeiting of foreign currencies within the United States, *U.S. v. Arjona*, 120 U.S. 479, 483 (1887).

Mr. Evans is charged with sexual abuse of a minor, all of which allegedly occurred in Germany sometime during May, 2007 through December, 2008.  This offense would not be considered an offense against the law of nation under the discrete definition: matters involving navigation, trade, diplomacy, or war.  Even if the Offenses Clause was given a more expansive reading, the alleged offense does not rise to the level of conduct that is universally condemned, such as torture, terrorism, or piracy.  While the seriousness of the alleged offense should in no way be diminished, Mr. Evans' alleged actions were nothing so out of the ordinary to fall under the Offenses Clause.

This leaves clause 14 as the remaining potential source of constitutional authority cited by Congress in enacting MEJA.  This clause allows Congress to "make rules for the government and regulation of the land and naval forces."  U.S. Const. Art. I, sec. 8, cl. 14.  However, the "land and naval forces" clause should be given strict construction.  More specifically, the Supreme Court has held that Article I, section 8, clause 14 does not grant the authority for Congress to provide for the trial by court martial of civilian dependants for offenses committed overseas.  *See Reid*, 354 U.S. at 19 (plurality opinion); *Kinsella*, 361 U.S. at 248 (Congress lacks the power under clause 14 to provide for military prosecution of civilian dependants of military members for crimes committed overseas).  "The term 'land and naval force' refers to persons who are members of the armed services and not to their civilian wives, children and other dependants."

*Reid*, 354 U.S. at 19-20.  It is clear that "the power granted Congress 'To make Rules' to regulate the 'land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces.'" *Kinsella*, 361 U.S. at 240 (quoting *U.S. ex rel. Toth v. Quarles*, 350 U.S. 11, 15 (1950)).  Therefore, U.S. authorities had two choices when addressing the alleged offense committed by Mr. Evans - either proceed under court martial or satisfy itself with the outcome of Germany's decision to decline prosecution after a full investigation.  Furthermore, Congress cannot use the Necessary and Proper Clause to extend jurisdiction to any group of people not covered by clause 14.  *Reid*, 354 U.S. at 21; *Kinsella*, 361 U.S. at 248.

**II.    MEJA is an unconstitutional delegation by Congress to the Executive Branch of the exclusive power and responsibility of Congress to define crimes, ranges, and types of punishment, and adjudicative procedures**

Congress has created two separate, incompatible and inherently unequal systems of criminal justice - military, as embodied by the Uniform Code of Military Justice, 10 U.S.C. § 801, et. Seq., and civilian, as embodied in the federal criminal code and rules.  The two systems have vastly different substantive criminal provisions, ranges and types of punishment, and adjudicative procedures.  In this case, the differences include: 1) the civilian count against Mr. Evans carries a mandatory minimum sentence of 30 years while the military offense would not carry a mandatory minimum sentence; and 2) there is no parole in the civilian system while Mr. Evans would be eligible for parole had he been prosecuted by the military.

The grossly disparate substantive criminal provisions, ranges, and types of punishment applied to Mr. Evans as opposed to if the military had prosecuted him, are a result of the decision

made by the Department of Justice. Justice did not prosecute him while he was still a member of the Army. Instead, they waived jurisdiction to Germany. After more than 1 year of investigating the allegations by both Germany and Army CID, Germany declined to prosecute. During the entire investigation, Mr. Evans was held by Germany and/or Army CID and was told he could not leave Germany - all the while Mr. Evans was a member of the Army Reserves. In May, 2009, Germany terminated the investigation and declined prosecution. From May, 2009 through October, 2010, Army CID continued to investigate and may have asked Germany to reconsider. By October, 2010, the U.S. government knew that Germany would not prosecute Mr. Evans. However, they waited until January, 2011, the month after Mr. Evans was released from the Reserves to request jurisdiction.

Choosing to prosecute in the civilian criminal justice system someone who could be made subject to the military justice system denies Mr. Evans due process. Also, allowing the Executive Branch unguided and unreviewable discretion to determine at its whim which of the two (if not three) disparate systems to apply violates the separation-of-powers principle and constitutes an unconstitutional delegation by Congress to the Executive Branch of the exclusive power and responsibility of Congress to determine what conduct is subject to criminal sanction and set forth the procedures for the adjudication of criminal cases. *See Touby v. U.S.*, 500 U.S. 160, 165-66 (1991).

**III.    The decision to prosecute Mr. Evans' after Germany concluded its investigation is a violation of Mr. Evans' due process and the purpose of the statue**

The decision by the Department of Justice to allow Germany to prosecute the alleged

offense even though Mr. Evans could have been prosecuted under the Uniform Military Code of Justice, then to "take back" the prosecution of the case only after they were not satisfied with the result of Germany's year-long prosecution in which Army CID assisted in investigating, so that they could get a "second bite at the apple" is a violation of Mr. Evans' right to due process and is not consistent with the purpose of the statute.

The Department of Justice should have prosecuted Mr. Evans' under the Uniform Military Justice Code because at the time that the offense allegedly occurred and for more than 1 year after M.C. alleged the offense, Mr. Evans' was either an active member of the United States Military or a member of the Reserves.  Therefore, primary jurisdiction lay with the United States Army.  But, even if somehow the Department of Justice could argue that he was not subject to court-martial, then under the Status of Forces Agreement, the United States had concurrent jurisdiction with Germany to prosecute Mr. Evans; but chose to allow Germany to proceed with prosecution.  *See* Article VII, Statute of Forces Agreement (exclusive jurisdiction only attaches when the alleged offense is punishable by the receiving state but not the sending state).

Since the essence of due process is that it protects individuals from the actions of the government, a due process violation exists when the government unreasonably hinders the fundamental rights of "liberty."  At the core of the due process is the integrity of the criminal justice system.  Thus, due process requires that the criminal justice system be fundamentally fair.  Under the circumstances presented in Mr. Evans' case, a prosecution of Mr. Evans in a civilian court in the United States is a violation of due process because all of the post-crime events that enabled the United States to acquire jurisdiction in federal court were initiated by the U.S. government, not Mr. Evans.

A substantive due process violation occurs when a decision by the government "shocks the conscience." *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992). In the context of Mr. Evans' case, his prosecution in a civilian court under the facts presented is the height of arbitrariness because all of the post-crime acts that led to his civilian prosecution - the decision not to pursue court-martial, the decision to allow Germany to proceed with prosecution, the decision to request jurisdiction from Germany but not until well after Germany declined to prosecute but just one month after Mr. Evans' was released from the Reserves - were matters over which he had no control or volition because they were orchestrated by military or civilian government personnel. To persist in a civilian prosecution under these circumstances constitutes denial of substantive due process. At the very least, Mr. Evans' has been denied procedural due process which allows a deprivation of liberty only if the government has acted "in a fair manner." *U.S. v. Salerno*, 481 U.S. 739, 746 (1987). Here, it can hardly be claimed that the government is treating Mr. Evans in a fair manner when they 1) made the decision in 2009 to allow Germany to pursue prosecution even though Mr. Evans' could have been subject to court-martial; 2) participated in the full investigation of Mr. Evans that spanned more than one year; 3) knew as early as May, 2009 but certainly by October, 2009 that Germany had determined that based on questions concerning M.C.'s veracity, Germany would not prosecute Mr. Evans; 4) waited until the month after Mr. Evans was released from the Reserves before requesting jurisdiction; and 5) waiting more than 3 ½ years after requesting jurisdiction, without conducting any further investigation, to prosecute this case after Mr. Evans had returned from Germany so that the government could get a "second bite" at Mr. Evans.

Simply put, based on the government's own decisions, for some reason, or no reason, the

government declined to exercise jurisdiction over Mr. Evans from 2009-2011.  But, more than 1 ½ years after they were notified of the alleged offense, the government decided to utilize 18 U.S.C. § 3261 as a means to prosecute Mr. Evans.  Allowing the government to create jurisdiction after the fact where none existed at the time that the offense allegedly occurred or during the 1 ½ year investigation during which time Germany maintained jurisdiction, simply by waiting until after Mr. Evans' was released from the Reserves and after the Department of Justice decided it did not like the outcome of the German investigation, which they were an integral part and which is the only investigation that actually occurred in this case deprives, Mr. Evans of life and liberty without due process of law.

   The decision to "take back" jurisdiction only after the government was dissatisfied with Germany's decision to decline prosecution after a full-investigation also is not consistent with the purpose of MEJA.  MEJA states in the body of the statute: "No prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General (or a person acting in either such capacity) . . . ." 18 U.S.C. § 3261.  This language is contained in the statute because MEJA was created because "host countries often do not chose to assert their jurisdiction to try American civilians who commit crimes in their countries.  This is most often the case when the crime was committed against another American." See H.R. Rep. No. 106-778, pt. 1 at 14 (2000).  In this case, Germany spent more than 1 year investigating this case and found that the evidence was not sufficient to prosecute.  Because the purpose of MEJA was to create a "long-arm" statute in situations where the foreign country

refused to assert their jurisdiction or where there is "no functioning government [that] exists to prosecute", MEJA cannot apply in this case.  Id.  Therefore, even if the Court believes that MEJA is constitutional, it does not extend to a case like Mr. Evans where there was a full investigation, which included assistance by the United State government, and only after a full investigation did the host country decline to prosecute.  Accordingly, the U.S. government does not have jurisdiction in this case.

## Conclusion

For the reasons set forth above, 18 U.S.C. § 1361, on its face and as applied in this case is unconstitutional.  Further, application of 18 U.S.C. § 1361 in this case is a violation of the separation-of-powers principle; the nondelegation doctrine; and the Due Process Clause of the Fifth Amendment.  Finally, the government does not have jurisdiction over this case because MEJA was not created to prosecute cases where there was a full investigation by the host country.

Respectfully submitted,

KEVIN L. BUTLER
Federal Public Defender

**/s/Sabra M. Barnett**
Sabra M. Barnett

Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Alabama
505 20th Street, North, Suite 1425
Birmingham, Alabama 35203
(205) 208-7170 Office
sabra_barnett@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

Respectfully submitted,

**/s/ Sabra M. Barnett**
Sabra M. Barnett
Assistant Federal Public Defender