FILED

2015 Aug-04  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **V.** | ) | **Case No.: 1:14-CR-333-AKK-JEO** |
| | ) | |
| **RICK LEE EVANS** | ) | |

## MR. EVANS'S SUPPLEMENTAL BRIEFING IN SUPPORT OF HIS FOURTH MOTION TO DISMISS - LACK OF JURISDICTION

Comes now, Mr. Rick Lee Evans, through undersigned counsel and pursuant to Fed. R. Crim. P. 12(b)(3), and submits this Supplemental Brief in support of his Fourth Motion to Dismiss for Lack of Jurisdiction filed on February 10, 2015 (Doc. 37).  Mr. Evans incorporates his Fourth Motion Dismiss as if fully set forth herein.

### Introduction

Mr.  Evans's Fourth Motion to Dismiss addresses questions of jurisdiction.  First, Mr. Evans argues that the Military Extraterritorial Jurisdictional Act ("MEJA") is unconstitutional. Second, Mr. Evans argues that he should have been prosecuted by Court Martial because the alleged offenses occurred while Mr. Evans was a member of the Army and the Army Reserves. Finally, Mr. Evans argues that if the Court decides that MEJA is constitutional, that the statute prevents prosecution in this case because Mr. Evans was prosecuted by German authorities and because the United States did not receive the proper jurisdictional waiver as required by the Status of Forces Agreement.  This Supplemental Brief provides additional argument for why this case has violated Mr. Evans's due process rights.

This Indictment violates Mr. Evans's due process rights because it is the government's

"third bite at the apple."  Mr. Evans should have been tried by Court Martial.  However, the government deferred its prosecutorial right to Germany.  The decision to defer prosecution cannot now be held against Mr. Evans because the government is unhappy with how Germany handled the case.  This is especially true in MEJA cases, where the statute was not enacted in contemplation of cases like Mr. Evans where the receiving state chose to prosecute.  In fact, the plain language of the statute states that a MEJA case cannot be brought where the receiving state has prosecuted.  And finally, the government did not receive the proper waiver under the Status of Forces Agreement to prosecute this case.

**Relevant Facts**

The government provided an undisputed timeframe of Mr. Evans's service in the United States Army in its Supplemental Briefing in Response to Mr.  Evans's Second Motion to Dismiss, filed on May 18, 2015 (Doc. 59).  Mr. Evans was an enlisted member of the United States Army from June 29, 2004 through June 28, 2008.  Mr. Evans was a member of the United States Army Reserve from June 29, 2008, through March 1, 2011.  However, documents provided by the government show that while a member of the Army Reserves, Mr. Evans was ordered to be on Active Duty from March 19, 2009 through February 3, 2010.[1]

It also is undisputed that M.C. lived with Mr. Evans and his wife from May 2007 through December 2008.  Finally, it is undisputed that on July 10, 2009, the United States Army sent a letter to Germany stating that because Mr. Evans was a "civilian," that Germany had jurisdiction

---

[1]**Exhibit A**, Department of the Army Rescind Notice, 2/3/10.

over this matter.[2]  Following this letter, Germany filed an official complaint against Mr.  Evans

on July 23, 2009.[3]  After close to one year of investigating the matter, the German prosecutor

dismissed this case on June 24, 2010.[4]  On January 24, 2011, the United States Army requested

Germany waive jurisdiction in accordance with the Status of Forces Agreement.[5]   On February

8, 2011, the United States Army received a letter from the German prosecutor's office providing

discovery in the case.[6]  This is the last correspondence provided between the two countries.

**Argument**

**I.     If the U.S. Government wanted jurisdiction over this case, then a Court Martial was
the appropriate forum for prosecution**

The government concedes that Mr. Evans could have been ordered to active duty for the

purpose of trial by court-martial.  *See* G's. Supp. Brief (Doc. 59), at p. 11.  The government's

position is that for any criminal acts that occurred during May 2007 and June 2008, Mr. Evans

could have been called into active duty in accordance with 10 U.S.C. § 802(d)(1)(A)-(B).  The

government argues, however, that he would not have been subject to the Uniform Code of

Military Justice ("UCMJ") for the period from June 28, 2008 through December 31, 2008

---

[2]**Exhibit B**, letter from CID, 7/10/09.

[3]**Exhibit C**, Criminal Complaint, 7/23/09.

[4]**Exhibit D**, Dismissal of charges, 6/24/10..

[5]**Exhibit E**, Army letter, 1/24/11.

[6]**Exhibit F**, German Prosecutor letter, 2/8/11.

because he was in the United States Army Reserves during that time.  First and foremost, this is contrary to the government's Indictment (Doc. 1), which states Mr. Evans was subject to the UCMJ until December 10, 2010.  Second, the government has yet to provide any timeline as to when the actual alleged conduct occurred other than to state that it happened "at least three times" over the course of the time when M.C. lived with Mr. Evans.  Therefore, it is not clear whether any alleged conduct occurred while Mr. Evans was a member of the Reserves. Nonetheless, the government could have charged him under the UCMJ for the period of time that Mr. Evans enlisted in the United States Army and was living with M.C. – May 2007 through June 28, 2008.  This is especially true considering the only timeframe provided by the government is that the first (of three) offenses occurred within three weeks of M.C. meeting Mr. Evans, which would have been sometime in early 2007 – not even within the timeframe outlined in the Indictment.  And if the government did believe that one conviction was not enough, they could have tried him for any other unlawful conduct, which allegedly occurred during the following year when he was on active duty.  If they were successful, they could have tried him for any unlawful conduct which allegedly occurred while Mr. Evans was in the United States Reserves for the next six months because persons in custody as a result of Court Martial are subject to Court Martial.  *See* 10 U.S.C. § 802(a)(7).

The government also ignores other ways that the UCMJ did apply.  For instance, the government provided personnel data showing that Mr. Evans was considered "active duty" from March 19, 2009, through February 10, 2010, when the active duty order was rescinded.[7] Therefore, Mr. Evans was "active duty" from the time that he was first accused – July 2009,

---

[7] **Exhibit A**.

4

through February 10, 2010. As an "active duty" Reservist, Mr. Evans was subject to Court Martial. Mr. Evans also was subject to Court Martial because the UCMJ allows for prosecution of people "accompanying the armed forces" outside the United States. *See* 10 U.S.C. § 802(10). In fact, the Code of Federal Regulations ("CFR") implementing the polices and procedures of MEJA state, "this Act was not intended to divest the military jurisdiction and recognizes the predominant interest of the military in disciplining its service members." *See* 32 CFR §153.2(d); *see also* 18 U.S.C. 3261(d) (prohibiting prosecution against a person subject to the UCMJ except where they cease to be subject or where they have been indicted with co-defendants not subject to the UCJM); DOD Instr. 5525.1, Sec. 2.6.1, 2.6.2. In light of the various ways in which the UCMJ applied, primary jurisdiction lay with the United States Army. Yet, despite Mr. Evans being subject to the UCMJ, Army CID sent a letter dated July 9, 2010, stating that Germany had jurisdiction because Mr. Evans was a "civilian."

By deferring prosecution to Germany even though Mr. Evans was subject to the UCMJ, the government violated Mr. Evans's due process rights. The government, either intentionally or with reckless disregard to Mr. Evans's status, deferred prosecution to Germany. By deferring to Germany, Mr. Evans waited more than one year to receive Germany's decision, during which time Army CID would not let him leave the country. When Germany dismissed its case on June 24, 2010, the United States waited 7 months before it requested jurisdiction in the case. Yet, all the while, it could have subjected Mr. Evans to Court Martial. In the meantime, the government did not pursue charges for another 3 ½ years during which time Mr. Evans lost his ability to call key witnesses in the case, lost his ability to be subject to the UCMJ, and was deprived of other key rights and liberties.

II.    **Because the United States deferred prosecution to Germany, Germany's decision to dismiss the prosecution must be respected**

The government argues that it properly deferred its prosecution to Germany.  G.'s Supp. Brief (Doc. 59), at p. 12.  While Mr. Evans argues that he should have been subject to the UCMJ, Germany's prosecution of Mr. Evans was swift and thorough.  During the entirety of the investigation, Army CID – both abroad and in Germany – assisted the German authorities.  During the year-long investigation, more than 30 people were interviewed by German police and Army CID.  Two search warrants were conducted: one in Germany and one in the United States.  M.C. underwent two forensic interviews conducted in the United States.  The German authorities hired an expert to provide an opinion about the validity of M.C.'s account of the allegations.  Forensic analysis was conducted on Mr. Evans's seized computers as well as the sex toys found in the United States.  After review of all of the evidence, Germany dismissed the case in accordance with § 170 of the German Criminal Code.[8]

Article VII(3)(c) of SOFA provides that authorities of the state having jurisdiction "shall give sympathetic consideration to a request from the authorities of the other state for a waiver of its right in cases where that other state considers such a waiver to be of particular importance."[9] Article VII(3)(c).  Article 19 of the SOFA Supplementary Agreement with Germany provides that at the request of the sending state, Germany shall waive in favor of the sending state the primary right in cases of concurrent jurisdiction.  Article 19, SOFA Supp. Agt.[10]  Yet, despite the

---

[8]**Exhibit D**.

[9]**Exhibit G**, Article VII, Status of Forces Agreement.

[10]**Exhibit H**, NATO Supplementary Agreeemnt.

multitude of treaties allowing the United States to request jurisdiction, assuming it did not have primary jurisdiction, the United States did not make the request until after it was dissatisfied with Germany's decision to dismiss the case.   In fact, the letter from the United States Army clearly shows that it was attempting to get "another bite at the apple."  Sophie Zach states in her request that while the United States respects Germany's decision, they believe that they can successfully prosecute Mr. Evans and that they expect Mr. Evans will "be sentenced to several years of imprisonment in a U.S. proceeding."[11]  This decision is a violation of Mr. Evans's substantive due process as well as his procedural due process rights.

As soon as the United States was notified of the allegations, the United States could have proceeded under the UCMJ.  The United States also could have claimed primary jurisdiction because Mr. Evans was either a member of a force or a civilian component at the time of the allegation and because his offense was allegedly committed against a United States citizen. Further, even if the United States believed that Germany had primary jurisdiction, it could have asked for a waiver of prosecution for which Germany would have given "sympathetic" consideration.  As discussed in Mr. Evans's original Second Motion to Dismiss, the government's decision to wait more than five years after the initial allegation to prosecute Mr. Evans, during which time other prosecutorial entities got a "bite of the apple," "shocks the conscience" and is a violation of his substantive due process rights.  And, Mr. Evans has been denied procedural due process because the government did not act in a "fair manner" when it decided to go for a "third bite at the apple."  The United States must be made to accept the decision by Germany.  Any other option violates Mr. Evans's right to a fair trial.

---

[11]**Exhibit E**.

**III.     The United States did not receive a waiver from Germany as required by SOFA and MEJA**

The government concedes that it could not prosecute Mr. Evans without a waiver from Germany.  *See* G.'s Supp. Brief at p. 13.  In its Supplemental Brief, the government cites to MEJA's provision prohibiting prosecution while the accused is being prosecuted or has been prosecuted in another country with jurisdiction. *Id*. (citing 18 U.S.C. § 3261(b)). Therefore, the government concedes that Germany had to release jurisdiction in order for the United States to proceed with prosecution.  But, the government has not provided the Court with the release of jurisdiction.[12] Although SOFA provides a mechanism for the sending state to receive a waiver, the United States did not receive one.  Article 19 of the Supplement Agreement goes into great detail about the waiver.  It provides that Germany may transfer a case for investigation, trial, and decision and that it shall provide a waiver of jurisdiction in cases where it is requested, except for in specific circumstances.[13] Yet, the only correspondence from Germany was a letter transmitting the discovery in the case for the U.S. Army's "information and keeping."[14]  Because jurisdiction was never waived, the government cannot prosecute Mr. Evans under the jurisdictional provisions of MEJA because: 1) 18 U.S.C. §3261(b) prohibits prosecution where the accused has already been prosecuted, unless the government has received approval from the Attorney General

---

[12]*See* Article VII, 3.c ("If the State having the primary right decides not to exercise jurisdiction, it shall notify the authorities of the other State as soon as practicable. The authorities of the State having the primary right shall give sympathetic consideration to a request from the authorities of the other State for a waiver of its right in cases where that other state considers such waiver to be of particular importance.") .

[13]  *See* **Exhibit H**, NATO Supplementary Agreement at Article 19.1, 5(a).

[14]See **Exhibit F**.

or Deputy Attorney General, which it has not; and 2) because the United States deferred

prosecution to Germany and has not received a release of jurisdiction satisfying the release

requirements under SOFA.

**IV.     MEJA prohibits the United States from exercising jurisdiction over Mr. Evans where Germany previously exercised jurisdiction over the same offense conduct**

In recent discovery provided by the Government, the United States provided a Diplomatic

Note to Germany explaining the purpose of MEJA.  Specifically, the Note states: "Further, this

jurisdiction will generally apply only in situations in which authorities of Germany are unable, or

decline, to prosecute the offense in question."[15]  The "White Paper" forwarded to Germany

explains that the purpose of MEJA is to prosecute "civilians" for crimes over which the host

nation was authorized to exercise jurisdiction but "have chosen not to prosecute."[16]  Further, the

White Paper explains:

> MEJA specifically states that no prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such an offense, except on approval of the Attorney General or the Deputy Attorney General. . . . MEJA does not purport to alter the language of the existing SOFA [Status of Forces Agreement] jurisdictional provisions, nor does MEJA attempt to usurp existing host nation prerogatives concerning the exercise of host nation criminal jurisdiction over the individuals at issue.  In fact, we anticipate that this authority will be used in only a very small number of cases, as the exercise of MEJA jurisdiction will only be for offenses punishable by imprisonment for more than one year under U.S. law, and in most cases <u>only where the host nation has chosen not to prosecute</u>. . . Again, the United States anticipates that jurisdiction under this statute will be exercised in only a very small number of cases.  When U.S. military authorities investigate, arrest, detain, or remove personnel under MEJA, they will be exercising jurisdiction under the NATO SOFA.

---

[15]**Exhibit I**, United States Diplomatic Note.

[16]**Exhibit J**, United States White Paper.

Id. at #1312-1315 (emphasis added).

The legislative history and implementation procedures all support that MEJA was not enacted to prosecute people who are investigated and prosecuted by the host country. 32 CFR § 153 provides for the policies and procedures of implementing a prosecution under MEJA. It contemplates a situation where the host country is not exercising jurisdiction over the case. For instance, § 153.5 discusses investigations into violations of MEJA by stating that the investigation "must respect the sovereignty of the foreign nation in which the investigation is conducted in accordance with recognized practices with host nation authorities." 32 CFR § 153.5. This type of procedure contemplates a situation where the United States is conducting the investigation because the host country is not involved. That was not the case in Mr. Evans. Germany was the primary investigator because the United States had deferred prosecution and Germany had exercised jurisdiction over Mr. Evans.

Department of Defense Instruction 5525.11 specifically states that the implementation instructions of MEJA "may not be interpreted as superseding the terms and conditions of a pre-existing Status of Forces Agreement (SOFA)." DOD Instr. 5525.11, 2.7. And, the legislative history of MEJA repeatedly demonstrates that the purpose of the legislation is to "close a jurisdictional gap" where a host nation refuses to prosecute an accused. The legislative history provides the reason for prosecutions under MEJA. It states:

> Because many crimes . . . do not have extraterritorial effect, there is a 'jurisdictional gap' that, in many cases, allows such crimes to go unpunished. Although host foreign nations have jurisdiction to prosecute such acts committed within their nation, they frequently decline to exercise jurisdiction when an American is the victim or when the crime involves only property owned by

10

> Americans. . . .  For acts that violate the laws of both countries, the SOFA gives
> either the United States or the host nation a primary right of jurisdiction . . . .  The
> nation with the primary right of jurisdiction may waive that right, either on its
> own initiative or at the request of the other nation. . . . Surprisingly, host countries
> often do not choose to assert their jurisdiction to try American civilians who
> commit crimes in their countries. . . American civilians abroad go unpunished
> because the host nation chooses to waive jurisdiction over these crimes.

H.R. Rep. 106-778, pp. 5-7.  It also states that the bill specifically "prohibits a prosecution under

the new statute if a foreign government has prosecuted or is prosecuting such person for the

conduct constituting the offense in accordance with jurisdiction recognized by the United States."

*Id*. at p. 11.  The history goes on to explain that the prohibition against prosecution was included

because the committee recognized that "in some cases, the nation in which the crime occurs may

choose to prosecute the perpetrator of the offense under its own law.  In that event, this

subsection generally prohibits the United States from also prosecuting that person under United

States law, provided the host nation prosecution occurs in accordance with jurisdiction

recognized by the United States."  *Id*., at p. 16.  The legislative history does not say that the

United States can prosecute an accused when it is not satisfied with how the accused is

prosecuted by the host nation.  It prohibits prosecution – regardless of the outcome – unless

special permission is received from the Attorney General or the Deputy Attorney General, which

was not sought or granted in this case.

Prosecution of Mr. Evans is clearly prohibited by the plain reading of MEJA.  MEJA does

not extend jurisdiction to situations in which the accused has already been prosecuted by the host

nation.  This is true regardless of whether the United States received a waiver from Germany.  At

the time that the United States requested a waiver, it did not have jurisdiction under MEJA

because Germany had already spent a year prosecuting Mr. Evans.  MEJA was not enacted for

situations such as this case, and cannot be stretched to meet the strict jurisdictional requirements of the statute.  Therefore, MEJA does not provide jurisdiction. This case must be dismissed.

### Conclusion

For the reasons set forth above, 18 U.S.C. § 1361, on its face and as applied in this case, is unconstitutional.  Further, application of 18 U.S.C. § 1361 in this case is a violation of the separation-of-powers principle, the nondelegation doctrine, and the Due Process Clause of the Fifth Amendment.  Finally, the government does not have jurisdiction over this case because MEJA was not created to prosecute cases where there was a full investigation and prosecution by the host country.

Respectfully submitted,

KEVIN  L. BUTLER
Federal Public Defender

**/s/Sabra M. Barnett**
Sabra M. Barnett
Assistant Federal Public Defender
Office of the Federal Public Defender
Northern District of Alabama
505 20th Street, North, Suite 1425
Birmingham, Alabama 35203
(205) 208-7170 Office
sabra_barnett@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 4, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all parties of record.

Respectfully submitted,

**<u>/s/ Sabra M. Barnett</u>**
Sabra M. Barnett
Assistant Federal Public Defender