FILED

2015 Nov-30  PM 05:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **2:14-CR-333-AKK-JEO** |
| | ) | |
| **RICK LEE EVANS** | ) | |

## UNITED STATES' TRIAL BRIEF

### I.    CHARGES

The Military Extraterritorial Jurisdiction Act makes it a federal crime or offense for someone, while accompanying the Armed Forces outside the United States or while a member of the Armed Forces subject to the Uniform Code of Military Justice, to engage in conduct that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States.

The Indictment charges Defendant with one count of aggravated sexual abuse of a child in violation of 18 U.S.C. § 2241(c). Specifically, Defendant is charged with being a member of the Armed Forces and later a dependent of a Department of Defense employee during the time that he sexually abused the then 5-year-old victim in this case.

Title 18, United States Code, Section 2241(c) makes it a federal offense for anyone to knowingly engage in a sexual act, such as the intentional touching, not through the clothing, of the genitalia of a person, with the intent to abuse, humiliate, harass, degrade the person, or to arouse or gratify the sexual desire of the Defendant or any other person. A defendant can be found guilty of this charge, in its MEJA form, only if the following elements are proven beyond a reasonable doubt:

First:     The defendant was a member of the Armed Forces or accompanying the Armed Forces outside the United States;

Second:   The defendant knowingly engaged in a sexual act outside the United States; and

Third:    The sexual act was with a person who had not attained 12 years.

The term "Armed Forces" means the United States Army, Navy, Air Force, Marine Corps, or Coast Guard.

The term "accompanying the Armed Forces outside the United States" means the defendant was:

(a)     A dependent of an employee of the Department of Defense; and

(b)     Residing with such employee outside the United States; and

(c)     Not a national of or ordinarily a resident in Germany.

The United States does not have to prove that the Defendant knew that the victim was younger than 12 years old.

The term "sexual act" means: an intentional touching – not through the clothing – of the genitalia of a person, with the intent to abuse, humiliate, harass, degrade the person, or to arouse or gratify the sexual desire of the Defendant or any other person.

## II.   SUMMARY OF FACTS

The following is a summary of the facts the United States expects to be developed during the trial of this case.  It is intended for the convenience of the trial court and in no way limits or binds the United States.

At trial, the evidence will show that from approximately May 2007 to December 2008, M.C., who was 4-5 years old, resided in Germany with Defendant Evans and his then-wife while M.C.'s mother and stepfather were deployed to Iraq in service to our country. During the approximately 18 months that M.C. lived with Defendant, he sexually molested M.C. on multiple occasions, including having M.C. touch his penis and attempting to get M.C. to eat his semen. Defendant would also rub his penis on M.C. and fondle her chest and genitalia. These events form the basis for the allegations in the Indictment: under-the-clothes touching of the genitalia (Defendant touching M.C. and M.C. touching Defendant) and intended to sexually arouse Defendant.

In addition to the child molestation charges in the Indictment, Defendant was convicted in Germany of possession of child pornography. On August 7, 2009, after

M.C.'s outcry in the United States regarding Defendant's sexual abuse of her during her parents' deployment in 2007 and 2008, the German authorities executed a search warrant at Defendant's residence in Heidelberg. That search and a subsequent search of Defendant's storage unit yielded multiple items that corroborated the child's allegations of abuse, including the sex toys she described that Defendant used on her and the pornography Defendant made her watch as part of his grooming process. Included in that pornography were hundreds of photos and videos depicting prepubescent children engaged in sexual acts.

The German Public Prosecutor proceeded against the Defendant with possession of child pornography charges and on July 29, 2010, the Heidelberg Municipal Court entered a penalty order and summoned his appearance. The Defendant never appeared and the court entered judgment against Defendant on November 22, 2010, ordering him to pay a monetary fine or serve 80 days in prison. Defendant eventually turned himself in on July 13, 2011, served approximately 37 days in jail, and paid the fine which placed him on a probationary period with the remainder of his imprisonment period suspended and ultimately dismissed on September 12, 2012.

Furthermore, towards the end of 2008, when it became clear that M.C.'s mother would soon be returning from deployment to resume full-time care of M.C., Defendant sought and obtained a position at a childcare facility in Germany despite

the fact that Defendant had no prior experience in child care, childhood education, or early childhood development. Typically, Defendant worked the "Parent's Night/Day Out" functions that were provided for military personnel. Those functions usually happened during off-hours at the U.S. Army's Child Development Center. On multiple occasions, other adults observed Defendant engage in inappropriate behavior with prepubescent children and Defendant was reprimanded for his behavior several times.

For example, during the 2009 Easter weekend (Easter Sunday was April 12th in 2009), the Site Chief of Outreach Services, Child and Youth Services, observed Defendant with a seven-year-old girl sitting on his lap. A supervisor verbally counseled Defendant against that kind of behavior but Defendant simply responded that he knew the child's parents and that Defendant was "cool with them." On another occasion, in early May 2009, adult witnesses observed Defendant calling over to him young girls, approximately 3-4 years old, and placing them on his lap, again for extended periods of time and in violation of the touch policy. On yet another occasion on approximately May 16, 2009, adult witnesses observed Defendant with a girl who was approximately four or five years old. According to one of the witnesses, Defendant bounced the little girl on his lap. The child was wearing a skirt, she sat straddled across his lap, and Defendant had her lie back on his legs. Defendant would then bring her back up to the sitting position and have her

lie back again. This lasted for approximately 15-20 minutes. The teaching assistant who observed this confronted Defendant about the activity but Defendant said it was okay. The teaching assistant then notified the Site Chief, who immediately instructed Defendant to stop.

In early July 2009, M.C. first made an outcry about Defendant's sexual abuse of her. M.C. made the initial outcry to her grandmother who is now deceased. Specifically, M.C. explained that Defendant taught her about sex and that he had her rub his "monster" that he kept in his shorts. M.C. further explained that Defendant had touched her with his "monster" and that he had also touched her vaginal and anal areas. On July 10, 2009, shortly after making the outcry to her grandmother, M.C. was interviewed by a professional forensic interviewer in Birmingham, Alabama. On at least three occasions during the July 10 interview, M.C. identified Defendant as the person who taught her about sex. On November 30, 2009, a different professional forensic interviewer, this time with the U.S. Military Police School, conducted an interview with M.C. Again, on multiple occasions, M.C. identified Defendant as the person who taught her about sex. She further explained what sexual acts Defendant forced upon her and had her perform on him. In addition, just as in the first interview, M.C. explained that Defendant had her watch videos of people having sex. The outcry to her grandmother was reduced to an affidavit signed by the grandmother and provided to the investigating agent at the time. The July 10

and November 30 forensic interviews were video recorded. All three statements have been made available to the defense.

## III.   POTENTIAL EVIDENTIARY ISSUES

### A. Stipulations

In the spirit of the Standing Discovery Order, the United States has sought a stipulation on Defendant's Army records both during the motion practice and again for trial purposes. Both times, the defense has refused to stipulate to the fact of Defendant's military service and dates of service. Similarly, the United States sought a stipulation to Defendant's conviction for child pornography in Germany by explaining that the stipulation would only be entered if the Court permitted the United States to admit such evidence of the prior conviction and that such stipulation would not waive Defendant's objection to the admissibility of the conviction itself. That offer to stipulate was also rejected.

The United States inquired if Defendant sought any stipulations from the United States, but he has not proposed any.

### B. Authentication of German Evidence

Assuming this Court permits the United States to introduce evidence of the fact of Defendant's possession of child pornography, the United States plans to authenticate and introduce the images through multiple witnesses. First, the United States will call German police detective Sven Stadtrecher, who will testify that he

was in Defendant's residence in Heidelberg on August 7, 2009 during the execution of the German search warrant where Defendant's electronic devices were seized for further analysis. Second, the United States will call former Army CID Special Agent Marie Perez to testify that she worked closely with the German police and that she obtained three CDs/DVDs from German police detective Bernhard Griebl on November 12, 2009. Additionally, the United States will call former Army CID Special Agent Jennie Callahan to testify that she obtained a copy of the German evidence on approximately May 21, 2014. Third, the United States will call Johnathan Bridbord, Assistant Director of the High Technology Investigative Unit at the Department of Justice, to testify that he examined the evidence on the CDs/DVDs obtained by Perez and Callahan, and found extracted artifacts that indicate the original source of the evidence, namely that the evidence came from devices that had user profiles in the name of "Rick Evans." Fourth, and finally, the United States will call Susan Evans, Defendant's estranged wife, to corroborate the seizure of devices and the user profile artifacts noted by Bridbord. The United States submits that the combination of these four witnesses will more than suffice for this Court to find that prima facie evidence has been demonstrated to satisfy Federal Rule of Evidence 901 that the child pornography and other computer artifacts came from Defendant's devices in his residence in Heidelberg in August 2009.

The original devices that were seized from Defendant's residence were destroyed by German authorities in 2010 without consultation with the United States, and about four years prior to the indictment in this case. It is undersigned counsel's understanding that once the German child pornography case against Defendant was completed, it was routine practice to destroy the devices containing such contraband. Ordinarily, the United States would seek that original evidence and perform an independent extraction using the same tools that the Germans used, such as FTK and/or EnCase, both of which are commercially available and industry standard software programs for extracting data from electronic devices. In addition to the original evidence being destroyed, the German computer forensic technician, Matthew Becker, who extracted the evidence that is contained on the CDs/DVDs provided to the United States by the German police, is very ill and unable to travel to the United States in time for the December 7, 2015 trial.

To the extent Defendant objects to the fact that the original evidence is no longer available or the German technician is not the one testifying to the extraction of the contents of Defendant's devices, the United States plans to satisfy the authentication requirements of Federal Rule of Evidence 901 as outlined above using the German detective who was present when the devices were seized from Defendant; the Army CID agents who obtained the extracted data from the German

law enforcement; the United States' expert who examined the extracted data for evidence of tampering and user identity; and Defendant's estranged wife.

Federal Rule of Evidence 901 provides: "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). To submit a piece of evidence to the jury, a judge must decide that the proponent of the evidence made "a prima facie case that the proffered evidence is what it purports to be." *United States v. Broomfield*, 591 Fed. Appx. 847, 851 (11th Cir. 2014) (citing *United States v. Belfast*, 611 F.3d 783, 819 (11th Cir. 2010)). After a judge rules that the proponent met this low burden, the "ultimate question of its reliability is reserved for the fact finder." *Broomfield*, 591 Fed. Appx. at 851. Here, the United States, as the proponent, seeks to admit the child pornography and other computer artifacts as originating from electronic devices within Defendant's residence in Heidelberg, Germany in August 2009.

Authentication can be established by examining the "appearance, contents, substance, internal patterns, or other distinctive characteristics [of the evidence] . . . taken together with all the circumstances." Fed. R. Evid. 901(b)(4). This can be accomplished "solely through the use of circumstantial evidence." *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990). "Thus, a document or telephone conversation may be shown to have emanated from a particular person by virtue of

its disclosing knowledge of facts known peculiarly to him." Fed. R. Evid. 901(b)(4),

Advisory Committee Notes, 1972 Proposed Rules.

The Eleventh Circuit has held that circumstantial evidence, including the contents of the evidence coupled with surrounding circumstances, warrants a finding of authenticity on a prima facie showing. *See, e.g., United States v. Broomfield*, 591 Fed. Appx. 847, 851-52 (11th Cir. 2014) (affirming that the United States made a prima facie showing that a YouTube video was authentic through three witnesses who testified that the defendant was in the video, when and where the video was recorded, and what specific rifle and ammunition was depicted); *United States v. Mentor*, 570 Fed. Appx. 894, 897-98 (11th Cir. 2014) (affirming that the United States made out a prima facie case that an incriminating letter was created by the defendant because the receiver of the letter testified that she knew the defendant wrote the letter because he was the only person that would send her a letter containing key details about her family and friends); *United States v. Siddiqui*, 235 F.3d 1318, 1322-23 (11th Cir. 2000) (finding that a number of factors supported the authenticity of emails sent by the defendant, including that the emails bore his email address, the reply function automatically connected to the defendant's email address, each email was signed by his nickname, the recipients spoke on the phone with the defendant soon after they received the emails, and the context of the emails included details about the investigation); *United States v. Green*, 40 F.3d 1167, 1173 (11th

Cir. 1994) (affirming the admission of a transcript of a tape recording without the preparer of the transcript testifying because the United States established the identity of the persons speaking through self-identification of each defendant during intercepted phone conversations, identification through nicknames, surveillance of phone subscriber information, and that the monitoring agents became familiar with the voices of the defendants); *United States v. Munoz*, 16 F.3d 1116, 1120-21 (11th Cir. 1994) (finding that a bank deposit slip found on the defendant was authentic because the slips and bank application bore the same account number of the bank, the deposit slips were kept in the defendant's possession, and the markings on the slips were typical of bank documents).

In *United States v. Gavegnano*, 305 F. App'x 954, 958 (4th Cir. 2009), the defendant argued that the trial court erred in "admitting the forensic report which detailed the contents of the computer containing child pornography" because, he claimed, "the chain of custody for the computer had not been adequately established because other individuals handled the computer after it was taken away from him, such that tampering could have occurred." The Fourth Circuit concluded that "the possibility that [someone] may have tampered with the computer, was an issue for the jury to consider," and accordingly affirmed the trial court's admission of such evidence.

In *Broomfield*, the defendant was convicted of illegally possessing a firearm. 591 Fed. Appx. at 847.  The United States admitted into evidence a YouTube video depicting the defendant using a gun at a firing range and authenticated the video during trial with circumstantial evidence.  *Id.* at 849.  The evidence included the testimony of a special agent who made a copy of the video and who stated that the defendant was the man depicted in the video. *Id.* The manager of a gun club testified that the defendant was a member of his club, and that defendant purchased ammunition from his store.  *Id.* The witness also watched the video and testified that he recognized the location of the recording as the firing range belonging to the club. *Id.* at 848-49.  Another employee of the gun store testified that he recognized the firing range in the video from its "numerous distinguishing features." *Id.* Finally, another witness established the approximate date in which the video was recorded. *Id.*

The Eleventh Circuit, in *Broomfield*, affirmed the video's admissibility, holding that because authentication may be shown solely by circumstantial evidence, the United States met its burden of presenting a prima facie case that the video depicted the defendant possessing a firearm.  *Id.* at 851-82.  It rejected the defendant's argument that the United States had to establish "the competence of the government's recording operator; the fidelity of the recording equipment; the absence of material deletions, additions, or alterations in the recording; and the

identification of the relevant speakers." *Id.* at 852 (quoting *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977)) (internal quotation marks omitted).  The Eleventh Circuit reasoned that the United States should not be required to always meet these specific factors because the United States did not create the video.  *Id.* It also noted that if the United States had to meet these requirements in every case, it would rarely, if ever, be able to authenticate a video that it did not personally create.  *Id.*

Here, the contents of the electronic devices can likewise demonstrate that they are what the United States purports them to be: machine-generated data extracted from devices that were found in Defendant's residence. As Mr. Bridbord will testify, based on his training, experience, and analysis of metadata, the extraction software used by the German police was EnCase[1] and FTK.[2]

FTK and EnCase are commonly used across the country, thereby providing this Court with an additional basis to credit the results in this case. *See, e.g., United*

---

[1] "EnCase Forensic Software is a software program developed by Guidance Software and is used internationally by Law Enforcement agencies to identify and document computer forensics evidence in criminal investigations. Among the features of EnCase is the ability to acquire, authenticate, and analyze digital evidence stored on computer system media. EnCase creates its reports in Rich Text Format (RTF) format so it may be universally viewed by word processing applications such as Microsoft Word, Apple Pages, and LibreOffice Writer." (Attachment A, Bridbord Report ¶ 2.)

[2] Forensic Toolkit (FTK) is software developed by AccessData Corporation and is used internationally by Law Enforcement agencies to identify and document computer forensics evidence in criminal investigations. Among the features of FTK is the ability to acquire, authenticate, and analyze digital evidence stored on computer system media. FTK creates its Case Report in web page format called HyperText Markup Language (HTML), so that it may be universally viewed using internet browser software such as Internet Explorer, Safari, Firefox and Chrome. (Attachment A, Bridbord Report ¶ 15.)

*States v. Gaynor,* 2008 WL 113653 (D. Conn. 2008) ("The applications most commonly used to conduct this analysis are Forensic Tool Kit (FTK), which is produced by Access Data, and EnCase, which is produced by Guidance Software."); *United States v. Mann,* 2008 WL 1701743 (N.D. Ind. 2008), *aff'd in relevant part,* 592 F.3d 779 (7th Cir. 2010) (detective conducted forensic exam of computer "using software commonly used by many forensic computer examiners called FTK"); *Gutman v. Klein,* 2008 WL 4682208, at n.2 (E.D.N.Y. 2008) ("An accomplished and experienced digital forensic examiner, ordered and authorized by the court, made a forensic copy, and used the FTK program, an accepted tool under industry standards, to perform the imaging and create a forensic duplicate of the hard drive.").

Mr. Bridbord will further testify that those software programs automatically extract certain kinds of data in a readable format, such as the filepath for the child pornography. For example, Mr. Bridbord will testify that the extraction from one computer revealed three user profiles, which would have been created by someone other than the manufacturer. Specifically, those three profiles were "Rick Evans," "Susan Evans" (Defendant's estranged wife), and a third profile identified by the first name of the victim in this case. In other words, the contents (user profiles) of that device demonstrate that the most likely users of that device were individuals with the exact same names as the three people living in Defendant's residence at the time M.C. lived with them, and two of those (Rick & Susan) were still living there

at the time of the German search warrant in August 2009. *See United States v. Hodges*, No. 14-11994, 2015 WL 4547950, at *3 (11th Cir. July 29, 2015) ("The contents of the videos and photographs also support a finding they were taken from a computer or external hard drive found in Hodges' house.")

Indeed, these exhibits are not hearsay because machine-generated information is not hearsay because a "person" is not making a statement. *See, e.g.*, *United States v. Lamons*, 532 F.3d 1251, 1263-65 (11th Cir. 2008) (finding machine-generated compact disc of data collected from telephone calls made on certain date not "testimonial" because statement of a machine); *United States v. Hamilton*, 413 F.3d 1138, 1142-43 (10th Cir. 2005) (finding, in child pornography case, computer-generated "header" information—including the screen name, subject of the posting, the date the images were posted, and the individual's IP address—was not hearsay; no "person" acting as a declarant).

In another case, basing its decision almost exclusively on the contents of the evidence and relying on one witness, the Eleventh Circuit determined that a letter was properly authenticated in *United States v. Mentor*, 570 Fed. Appx. 894, 896-98 (11th Cir. 2014) (unpublished).  Before trial, the district court admitted into evidence a letter that the defendant purportedly dictated to his former girlfriend.  *Id.* at 897. The former girlfriend testified that since the letter made specific references to her brother, her best friend, and other key details about her, the letter must have been

written by the defendant. *Id.* The Court affirmed the district court's decision to enter the letter into evidence, stating that since "the government made out a prima facie case that the letter was dictated by [the defendant], it was up to the jury to decide whether the letter was actually from [the defendant]." *Id.* at 897-98.

Here, similarly, Susan Evans will testify that she and Defendant had their own user profiles, Defendant's profile was password-protected, she did not know his password, and that those devices were seized during the German search. In addition, Susan Evans will testify that Defendant knew the password to her user profile. Defendant, of course, is still free to argue to the jury that the child pornography was not his, but the contents of the extracted data combined with the testimony of Susan Evans is more than prima facie evidence that the data the United States intends to introduce came from devices in Defendant's residence.

Other courts also have decided that the contents of evidence coupled with outside circumstances can be used to establish authenticity. *See United States v. Biggins*, 551 F.2d 64, 67 (5th Cir. 1977) (holding that even though the recording was a duplicate and not proven to be a faithful recording of the defendant's conversation, the recording was still admissible because testimony corroborated the contents of the recording and that the defendant spoke in the conversation); *Weste v. United States*, SA–07–CR–323–XR, 2013 WL 2896843, at *6-7 (W.D. Tex. June 11, 2013) (unpublished) (finding defense counsel not ineffective for failing to object to the

admission of emails because the United States only is required to make a prima facie showing that the emails were genuine); *United States v. Nobrega*, No. 1:10–cr–00186–JAW, 2011 WL 2116991, at *6-7 (D. Maine. May 23, 2011) (unpublished) (finding that chat conversations with the defendant may be admissible if the United States can authenticate authorship using the distinctive characteristics of the contents and the surrounding circumstances of the conversations).

Here, the contents of the report prove that the illegal images and videos came from Defendant's computer. The report indicated that there were three users of the computer, with one user named "Rick Evans." The report showed that a system software was installed and registered by the user "Rick Evans." User "Rick Evans" also installed a limited-access account in the name of the victim in this case. There were 3,381 reported log-ins from user "Rick Evans," and FTK and EnCase detected 160,000 images downloaded by user "Rick Evans." The report also demonstrates that EnCase detected and searched through deleted files, cookies, and URLs which referred to pornographic and non-pornographic sites. The cookies were associated with all three users of the computer.

Ninety percent of all of the pornographic images found on the electronic devices were found in special folders that were sorted by name. One folder on the Verbatim USB device was named "RICKS ADULT" and contained 286 images featuring child pornography. Filepaths to videos included in the "RICKS ADULT"

folder were named with vulgar terms that would indicate it contained child pornography, such as "13 yo brother fucks 11yo sister and sperm inside" and references to teenage rape and incest. These files were created between the years 2008 to 2009. Indeed, all of the files and cookies extracted have "last modified" dates that pre-date the German search in August 2009, which is further confirmation that there was no manipulation or alteration of evidence in the intervening years. Matching images of the temporary internet files under user "Rick Evans" and the original files were found in the "RICKS ADULT" folder.

Looking at the contents in its entirety, Defendant is the owner of the computer from which the data was extracted. Additionally, the contents of the report are coupled with outside circumstances that support the authenticity of the report.  A witness will testify that a number of people were at the Defendant's home the day the search warrant was executed, and that there were multiple computer devices seized from the Defendant's home. Army CID Special Agent Perez will also testify that she received the CDs/DVDs from German authorities who were assigned to Defendant's case. Similarly, Army CID Special Agent Jennie Callahan will testify that in May 2014 she contacted the German prosecutor's office at the request of the Department of Justice prosecutors handling the pre-indictment evaluation of this case, and obtained four CDs containing the contents of Defendant's electronic devices that had been examined and extracted back in 2009 before Perez picked up

the copies she obtained on November 12, 2009. Defendant's estranged wife will testify regarding the user accounts and Defendant's use of password protection to prevent her from accessing his account. Finally, a forensic expert will testify that the reports were unaltered and are in the original form from which they were found.[3]

## C. Marital Privilege

The United States intends to call Susan Evans, Defendant's estranged wife, as a witness. They were married in Colorado in 1993.  They have been living apart since approximately March 2012. When Defendant was arrested in 2014, he held himself out to be engaged to the woman he was living with, and Ms. Evans is currently engaged to another man. Ms. Evans is willing to testify about the following: Defendant's military status; her employment with the Department of Defense; M.C.'s timing living with her and Defendant; when M.C. was alone with Defendant; what sex toys and pornography Defendant had; and about Defendant's electronic devices. None of the proposed testimony by Ms. Evans is privileged.

---

[3] For what it is worth, the United States does not intend to introduce thousands or even hundreds of images of child pornography. Instead, the United States intends to introduce less than 5 videos and images that depict child pornography that is closest to the facts of this case. Specifically, the images will depict prepubescent children engaged in sexually explicit activity, such as the use of sex toys, as the victim in this case said she experienced. The United States would only seek to introduce more than this small sampling of child pornography if Defendant opens the door to the idea that those few images were all that were located, or that the ratio of child pornography to adult pornography was slight. If, however, Defendant does not dispute that more existed, the United States would not seek to introduce more images.

Federal Rule of Evidence 501 provides that common law generally determines issues of evidentiary privilege. Fed. R. Evid. 501 ("The common law--as interpreted by United States courts in the light of reason and experience--governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court."); *see also United States v. Singleton*, 260 F.3d 1295, 1300 (11th Cir. 2001) ("The general issue of evidentiary privilege in criminal cases is governed by the first sentence of Rule 501 of the Federal Rules of Evidence . . . ."). Therefore, the question of marital privilege in federal criminal cases is governed by current federal common law.[4] *Trammel v. United States*, 445 U.S. 40, 47 (1980) (stating that by passing Federal Rule of Evidence 501, "Congress manifested an affirmative intention not to freeze the law of privilege" with the purpose of "provid[ing] courts with the flexibility to develop rules of privilege on a case-by-case basis"). There are currently two marital privileges recognized by the federal common law: (1) adverse spousal testimony privilege and (2) the marital communications privilege. *Singleton*, 260 F.3d at 1297; *United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir. 1980).

The adverse spousal testimony privilege protects the witness-spouse from being compelled to testify adversely against the defendant-spouse about evidence of

---

[4] Nonetheless, federal courts construe the marital privileges narrowly because evidentiary privileges obstruct the truth seeking process. *United States v. Nixon*, 418 U.S. 683, 710 (1974); *Singleton*, 260 F.3d at 1299.

criminal acts, including non-confidential communications and matters that occurred prior to the marriage. *Trammel*, 445 U.S. at 49; *Entrekin*, 624 F.2d at 598. The adverse spousal testimony privilege is seemingly broad, but it is not absolute and has important limitations. *See United States v. Cameron*, 556 F.2d 752, 755 (5th Cir. 1977); *see also Trammel*, 445 U.S. at 52; *Singleton*, 260 F.3d at 1297. First, this privilege may **only** be asserted by the witness-spouse. *Trammel*, 445 U.S. at 53; *Singleton*, 260 F.3d at 1297. Second, it should only be applied where, under the circumstances of the case, the purpose of the privilege would be served. *Trammel*, 445 U.S. at 52. Because of this, the privilege does not exist, even for the witness-spouse, if the marriage is no longer viable or is "moribund." *Cameron*, 556 U.S. at 756 (finding no adverse spousal testimony privilege existed ". . . where, as here, the spouse was called to testify only as to objective facts, with no questions allowed as to any communication between the spouses, and where the evidence supported a finding that the marriage was no longer viable and its members had little hope or desire for reconciliation, reason, experience and common sense indicate that the traditional policy reasons for the privilege are non-existent").

The marital communications privilege, by contrast, bars the disclosure of confidential communications within the marriage. *Trammel*, 445 U.S. at 49; *Entrekin*, 624 F.2d at 598. "The privilege, generally, extends only to utterances, and not to acts." *Pereira v. United States*, 347 U.S. 1, 6 (1954). Unlike the adverse

spousal testimony privilege, the marital communications privilege can be invoked by either spouse.  *Singleton*, 260 F.3d at 1298 n.2 ("The marital communication privilege, when available, can be asserted by a defendant to prevent his or her spouse from testifying concerning the communication and to exclude related evidence.") Several exceptions to the marital communications privilege exist, including when the victim of the alleged offense is the witness-spouse or a child of one of the spouses *See Wyatt v. United States*, 362 U.S. 525, 526-27 (1960); *United States v. Breton*, 740 F.3d 1, 12 (1st Cir. 2014); *United States v. White*, 974 F.2d 1135, 1137 (9th Cir. 1992); *United States v. Allery*, 526 F.2d 1362, 1365 (8th Cir.1975); *United States v. Morris,* 2006 WL 2841069, at *2 (M.D. Ala. 2006). The exception has been found to extend to a child visiting in the home.  *United States v. Bahe*, 128 F.3d 1440, 1446 (10th Cir. 1997).  In *Bahe*, the Tenth Circuit stated:

> We see no significant difference, as a policy matter, between a crime against a child of the married couple, against a stepchild living in the home or, as here, against an eleven-year-old relative visiting in the home. Child abuse is a horrendous crime. It generally occurs in the home and is often covered up by the innocence of small children and by threats against disclosure. It would be unconscionable to permit a privilege grounded on promoting communications of trust and love between marriage partners to prevent a properly outraged spouse with knowledge from testifying against the perpetrator of such a crime. Exercising the "reason and experience" granted to us by Fed. R. Evid. 501 we recognize an exception to the marital communications privilege for spousal testimony relating to the abuse of a minor child within the household.

*Id.* (internal citations omitted). Alabama has codified all three exceptions. Ala. R. Evid. 504 ("There is no privilege under this rule . . . in a criminal action or proceeding in which one spouse is charged with a crime against the person or property of (A) the other spouse, (B) a minor child of either, (C) a person residing in the household of either . . . .").

Here, Defendant cannot invoke either the adverse spousal testimony privilege or the marital communications privilege to prevent Ms. Evans from testifying. Because Ms. Evans is willing to testify, Defendant cannot preclude her adverse spousal testimony. Moreover, even if Ms. Evans became unwilling to testify, her testimony could be compelled because their marriage is no longer viable. Defendant cannot invoke the marital communications privilege because Ms. Evans is not testifying to any confidential communications. Moreover, even if there are confidential communications to testify about, Ms. Evans could testify to them because the victim was a child living in their home. In short, Defendant cannot prevent Ms. Evans from testifying about Defendant's military status; her employment with the Department of Defense; M.C.'s timing living with her and Defendant; when M.C. was alone with Defendant; what sex toys and pornography Defendant had; and about Defendant's computer.

**D. Rule of Completeness – Federal Rule of Evidence 106**

Federal Rule of Evidence 801(d)(2) provides that a statement is not hearsay, and is therefore admissible, if the statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth. Statements made by Defendant in telephone calls and letters he made from jail are quintessential statements by a party-opponent when offered by the United States. Those very same statements, however, are inadmissible hearsay when offered by Defendant.

To ensure fairness, Federal Rule of Evidence 106 provides another avenue by which a party-opponent may admit at trial his own out-of-court statements, which would otherwise be inadmissible hearsay.  Specifically, Rule 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.Fed. R. Evid. 106.  The advisory committee notes explain that "[t]he rule is an expression of the rule of completeness . . . . The rule is based on two considerations.  The first is the misleading impression created by taking matters out of context.  The second is the inadequacy of repair work when delayed to a point later in the trial."  Fed. R. Evid. 106, advisory committee notes.

The Fifth Circuit has explained Rule 106 thus:

> At the same time Fed. R. Evid. 106 encourages completeness in writings or recordings, it restricts a

> requirement of completeness by the qualification that the portion sought to be admitted must be relevant to the issues, and only the parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted.

*United States v. Crosby*, 713 F.2d 1066, 1074 (5th Cir. 1983). The courts of appeals have "consistently held that the rule permits introduction only of additional material that is relevant and is necessary to qualify, explain, or place into context the portion already introduced." *United States v. Pendas-Martinez*, 845 F.2d 938, 944 (11th Cir. 1988); *see also United States v. Branch*, 91 F.3d 699, 728 (5th Cir. 1996) ("Although different circuits have elaborated Rule 106's fairness standard in different ways, common to all is the requirement that the omitted portion be relevant and necessary to qualify, explain, or place into context the portion already introduced.") (quoting *Pendas-Martinez*, 845 F.2d at 944).  Furthermore, just because an excluded portion is relevant, does not necessarily mean that it is necessary to qualify, explain or place into context.  *Branch*, 91 F.3d at 728 (affirming exclusion of statements as self-serving exculpatory statements by the defendant that did not explain or qualify the rest of the statement originally offered by the United States); *United States v. Langford*, 647 F.3d 1309, 1331 (11th Cir. 2011) (affirming exclusion of transcript of defendant's testimony in SEC hearing because defendant failed to identify what specific portions would qualify, explain or place into context the portions that were introduced by the United States); *United States v. Johnson*, 579 F. App'x 867, 870

(11th Cir. 2014) (affirming exclusion of recorded calls where defendant's requested additional portions failed to satisfy the "qualify, explain or place in context" elements of Rule 106).

Judge Posner, in *United States v. LeFevour*, 798 F.2d 977 (7th Cir. 1986), provided a colorful example of the rule of completeness and the unfairness it is intended to address: "An example would be accusing the Biblical David of blasphemy for saying, 'There is no God,' his full statement being, 'The fool hath said in his heart, there is no God.'" *Id.* at 981 (citing *Trial of Algernon Sidney*, 9 Howell=s State Trials 818, 868-69 (K.B. 1683)).  As the *LeFevour* court noted, "[w]e are far from that paradigmatic case here." *Id.*

Similarly, Defendant should not be permitted to introduce numerous self-serving exculpatory statements made during the same recording in which he makes a rare inculpatory statement. If he wishes to testify regarding his exculpatory statements, he has a right, although no obligation, to do so.  Regardless, he should not be permitted to place his entire defense before the jury through the self-serving hearsay statements made in his jail calls or in his letters from jail.

Below, the United States has precisely designated the statements it intends to introduce that are in the United States' possession and have been provided to Defendant.  By this trial brief, undersigned counsel is notifying defense counsel of each and every statement to be offered into evidence.

| Exhibit | Content |
|---|---|
| Jail call January 5, 2015 20:11 | Beginning to 00:28 & 09:40 to end – Discussion of stealing girls' panties from community laundry for 30 years |
| Jail call January 5, 2015 20:36 | Beginning to 03:13 – Continuation of discussion of stealing girls' panties from community laundry for 30 years |
| Jail letter – B1453-1454 | "Yes, I paid a fine in Germany, but I was told it was for illegal downloads and Susan and I both thought it was for my downloading TV shows and movies via rapidshare." |
| Jail letter – B1499-1500 | "I finished my 'Rick's Bucket List' last night. Now to work on my 'Rick's Adult Bucket List.' That should be quite interesting. And a little scary because you will find out just how freaky I am." "I really hope my 'Rick's Adult Bucket List' doesn't scare you away. I think it's all legal." |
| Jail letter – B1505-1507 | "What it all boils down to is a child's word that has changed her story about events each interview. Other than to say Mr. Rick taught me about sex….I treated her as my own. Taught her to do things on her own by making her do them but talking her through it. An example would be doing puzzles. I would take her through puzzles but she had to do it." |
| Jail letter – B1509 | Entire page. |
| Jail letter – B1513-1514 | "I have talked to God on all this and I am down to only 2 choices. I know I am not meant to go to jail for life. I know that is not God's plan for me. So know that isn't even an option to me. He is either going to set me free with a dismissal motion or he is going to have me take a plea." "I do want you to know that I am not doing anything until after the motions hearing. If God wants me to go free then that is when he'll do it. If not, I'll accept that he has a reason for me to go to prison and work on a plea deal." |

| | |
|---|---|
| Jail letter – B1515-1520 | "She [Susan] hated sex and I loved it." |
| Jail letter – B1525-1528 | "Lust is also a sin I am highly guilty of." |
| Jail letter – B1529-1532 | "With that said, 3 weeks ago I had no intention of taking the plea deal. Today with a few more questions pending I am 85% sure I'm going to take the plea. If I get the answers I think I will get next week I'm 100% sure I'll take the plea deal." |
| Jail letter – B1533-1544 | "It's not official yet but I have pretty much taken the plea deal." "There are a lot of classes I will have to take….The one that is most important to me is any and all anger management classes I can take." "I know I want to work on my anger management issues." "There is going to be one issue that may blow all of this off track….The one I do have issue with is a test that they put electrodes on the Cub and show images to see how the Cub reacts. That I will not agree to. I find it humiliating and honestly totally ineffective. What if I see something that reminds me of something you and I did? It's not the image they are showing causing the reaction but rather the thought of times past." |

In *United States v. Flentge*, 151 F. App'x 490 (8th Cir. Oct. 21, 2005), the United States, prior to trial, requested that three short segments from two fifteen-minute jail calls by the defendant be played at trial. *Id.* at 491. The defendant requested that the entirety of both calls be played for the jury, but the district court sustained the United States' objection to playing the entire conversations on the grounds that the additional statements contained in the calls constituted hearsay. *Id.* The trial court, however, did give the defendant the opportunity to enter into evidence other portions of the calls that would place the United States' three short

segments into context, but the defendant did not identify any additional portions. *Id.* Accordingly, the district court permitted the United States to play its previously identified segments without playing the entirety of the calls. The Eighth Circuit affirmed. *Id.*

To the extent Defendant believes that the statements to be offered against him are taken out of context, the burden is now on Defendant to provide an explanation as to what additional statements should be played so as to "qualify, explain, or place into context the portion already introduced." *Branch*, 91 F.3d at 728. Indeed, Rule 106's "qualifying words 'ought in fairness,' show that the duty to place 'any other part' of the recorded statement or any other 'recorded statement' in evidence is not absolute." *LeFevour*, 798 F.2d at 981. "[O]bviously, the admission of one recorded statement could not require the admission of every other such statement in the party's possession." *Id.* Such a rule would lead to absurd results.

In this case, for example, such a rule would mean that if the United States plays a two-minute segment, then it would also have to play the other 2,400 minutes (40 hours) because all such calls are in the possession of the United States. There is no basis in reason or common sense to conclude that it would take all 2,400 minutes to place those two minutes in context. By extension, there is no reason to believe that just because each call is broken into discrete fifteen-minute segments, that it takes an entire phone call to qualify, explain or place into context a particular

statement within that call.  As a matter of fact, it is conceivable that a statement in one phone call can only be explained or placed into context by playing a portion of an entirely different phone call, making the remainder of the original phone call entirely irrelevant for purposes of placing the offered statement in context. In other words, the entirety of a single phone call should not automatically be admitted simply because the United States has located a single statement it intends to offer against Defendant.  Just as the playing of one call should not require the playing of every other call, the playing of one statement from a single call should not require the playing of the entire call, unless every other statement in the call qualifies, explains or places in context the statement offered by the United States.  In other words, Rule 106 does not mandate that playing anything short of an entire conversation means the entire conversation must be played. The same is true for the statements from Defendant's letters from jail. Just because he says something in a couple of sentences that the United States seeks to introduce, does not mean the entirety of the letter should be automatically included as well, nor does it mean that all the other letters should be admitted.

Instead, Defendant should provide the United States, and this Court, with what additional statements Defendant believes will "qualify, explain, or place into context" the portions the United States intends to introduce so that this Court can make an informed decision as to the issue of fairness under Rule 106.  Failure by

Defendant to identify any specific statements Defendant wants admitted should result in this Court's denial of his request to play additional portions of the calls or introduce additional segments of the letters, on the grounds that Defendant has failed to carry his burden of demonstrating how the additional statements would "qualify, explain, or place into context" any specific statement offered by the United States. *Flentge*, 151 F. App'x at 491.

The United States intends to offer portions of the victim's two video recorded statements that were made on July 10, 2009 and November 30, 2009. The United States has filed a motion *in limine* seeking to admit those videos. (*See* Doc. No. 160.) To the extent this Court grants that motion to allow the United States to play the videos, the United States submits the below table to notify the Court and Defendant of the specific portions it intends to publish. These specific designations were previously provided to defense on November 23, 2015 in the form of the preliminary exhibit list as required by this Court's Order.

Similar to the statements of Defendant, the United States provides the beginning and end of each expected recorded clip so that Defendant can have an opportunity to provide sufficient advance notice to the United States and this Court if he wants additional clips played during the United States' case-in-chief. Note that the November 30, 2009 interview has a time stamp on the screen, and thus the United States uses that to signal the beginning and end of each clip. But the July 10, 2009

interview had no such time stamp on the screen. Consequently, for purposes of precision and clarity, the United States has designated the page and line number from the transcript that Defendant had prepared during the motions practice period of this litigation.

| |
|---|
| July 10, 2009 forensic interview video - Tr. 19:3 to 20:14 |
| July 10, 2009 forensic interview video - Tr. 30:11 to 34:7 |
| July 10, 2009 forensic interview video - Tr. 35:14 to 37:12 |
| July 10, 2009 forensic interview video - Tr. 44:1 to 44:7 |
| July 10, 2009 forensic interview video - Tr. 47:15 to 49:25 |
| July 10, 2009 forensic interview video - Tr. 53:19 to 54:25 |
| July 10, 2009 forensic interview video - Tr. 59:15 to 60:4 |
| July 10, 2009 forensic interview video - Tr. 60:22 to 61:14 |
| July 10, 2009 forensic interview video - Tr. 79:2 to 79:18 |
| July 10, 2009 forensic interview video - Tr. 82:24 to 83:3 |
| July 10, 2009 forensic interview video - Tr. 85:10 to 86:7 |
| November 30, 2009 forensic interview video - Clip: 11:12:56 to 11:13:57 |
| November 30, 2009 forensic interview video - Clip: 11:14:53 to 11:16:01 |
| November 30, 2009 forensic interview video - Clip: 11:18:00 to 11:18:32 |
| November 30, 2009 forensic interview video - Clip: 11:24:53 to 11:28:07 |
| November 30, 2009 forensic interview video - Clip: 11:32:07 to 12:00:43 |
| November 30, 2009 forensic interview video - Clip: 12:04:35 to 12:06:57 |
| November 30, 2009 forensic interview video - Clip: 12:07:24 to 12:08:47 |
| November 30, 2009 forensic interview video - Clip: 12:24:56 to 12:25:38 |

**E. Apostille**

To the extent this Court permits the introduction of evidence of Defendant's conviction in Germany for possession of child pornography, the United States intends to authenticate that conviction as a foreign official record under the apostille. Federal Rule of Criminal Procedure 27 provides that "[a] party may prove an official

record, an entry in such a record, or the lack of a record or entry in the same manner as in a civil action." Federal Rule of Civil Procedure 44 provides that:

> **(A)** *In General.* Each of the following evidences a foreign official record--or an entry in it--that is otherwise admissible:
> **...**
>> **(ii)** the record--or a copy--that is attested . . . by a certification under a treaty or convention to which the United States and the country where the record is located are parties.

Fed. R. Civ. Proc. 44. "An apostille is 'a standard certification provided under the Hague Convention for authenticating documents used in foreign countries.'" *United States v. Jaensch*, 665 F.3d 83, 89 n.4 (4th Cir. 2011) (quoting Black's Law Dictionary 112 (9th ed. 2009)); *see also Varpetyan v. Holder*, 406 F. App'x 236, 237 n.1 (9th Cir. 2010) (citing The Hague Convention Abolishing the Requirement for Legalisation for Foreign Public Documents, Oct. 5, 1961, 33 U.S.T. 883, 527 U.N.T.S. 189); *United States v. Nunez-Beltran*, 2010 WL 2985490, at *4 (S.D. Cal. July 26, 2010) *aff'd*, 434 F. App'x 640 (9th Cir. 2011) (explaining interaction of federal rules with international treaty); http://travel.state.gov/content/travel/en/legal-considerations/judicial/authentication-of-documents/notarial-and-authentication-apostille.html ("Apostilles authenticate the seals and signatures of officials on public documents such as birth certificates, notarials, court orders, or any other document issued by a public authority, so that they can be recognized in foreign countries that are parties to the Convention."); http://www.hcch.net/upload/apostille.pdf (example of apostille).

34

The apostille method of authenticating foreign official records has been used in federal courts for the purpose of admitting various types of records, including prior convictions, such as is proposed in this case. *See Mathew v. Mukasey*, 297 F. App'x 15, 15, 2008 WL 4725458, at *1 (1st Cir. 2008) (affirming admission of prior conviction based upon apostille records and finding that "it is plain that this record was admissible for the purposes of establishing petitioner's conviction"); *United States v. Vidrio-Osuna*, 198 F. App'x 582, 583, 2006 WL 1765764, at *1 (9th Cir. 2006) (affirming admission of foreign birth certificate "[b]ecause defendant's birth certificate had an apostille certification, [which made it] self-authenticating under the 1961 Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents.") (citing Fed. R. Crim. Proc. 27; Fed. R. Civ. Proc. 44(a)(2); Fed. R. Evid. 902(3)). Accordingly, the United States submits that the apostille method of authenticating Defendant's judgment of conviction in Germany is sufficient under the Federal Rules of Criminal Procedure, by cross-reference to the Federal Rules of Civil Procedure.

## F. Reasonable Accommodation of Child Witness

The United States respectfully requests that this Court make some modest accommodations for the child victim-witness in this case. First, the United States requests an oath that is appropriate for a 12-year-old. Second, the United States requests that counsel for both parties refrain from loud objections. Third, the United

States requests that counsel for Defendant engage in age-appropriate questioning of the child, including the limiting of leading questions. Fourth, the United States requests that the child be permitted to testify from outside of the presently configured witness box due to its extremely close proximity to Defendant's table.

### i.  Age Appropriate Oath & Child Friendly Objections

Federal Rule of Evidence 611(a) confers broad discretion on this Court in controlling: "the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."

In addition, Federal Rule of Evidence 603 permits witnesses to declare that they will testify truthfully by "oath or affirmation administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so." The Notes of the Advisory Committee state that "[t]he rule is designed to afford the flexibility required in dealing with ... children. Affirmation is simply a solemn undertaking to tell the truth; no special verbal formula is required." *See also* 1 U.S.C. § 1 (1988) ("oath" includes affirmation). *Spigarolo v. Meachum*, 934 F.2d 19, 24 (2d Cir. 1991). When children testify, the trial court may fashion an oath or affirmation that is meaningful to the witness. *Id*.; *United States v. Faison*, 2010 WL 2265833, at *3 (A.F. Ct. Crim. App. Apr. 19, 2010) ("Flexibility in the oath or affirmation requirement is often warranted for child witnesses who might be hard-

pressed to understand a formal oath or affirmation.") Accordingly, the United States requests that the Court exercise that control in the administration of the oath to the child witness.

The words attorneys and judges use in courtrooms everyday are frequently outside the scope of understanding of most children that will testify. Thomas D. Lyon, *Child Witnesses and the Oath*, *in* CHILDREN'S TESTIMONY: A HANDBOOK OF PSYCHOLOGICAL RESEARCH AND FORENSIC PRACTICE 245, 245–60 (H.L. Westcott, G.M. Davies & R.H.C. Bull eds., 2002). Among those words are those used by the Court in administering the oath to witnesses. For example, "do you solemnly swear" may mean something entirely different to a child than to an adult witness. The United States requests that rather than administering the standard oath for witnesses, the Court employ a child fair oath that the child will understand and agree to follow before testifying. The United States proposes that the Court simply ask the child: "Do you promise that you will tell the truth?" *See id.*; *see also United States v. Drift*, 2014 WL 4662505, at *1 (D. Minn. Sept. 19, 2014) (granting United States' motion in limine for a child friendly oath by agreeing to replace the term "swear" with "promise" to tell the truth); *United States v. Lamere*, 337 F. App'x 669, 671 (9th Cir. 2009) (affirming district court's method which "administered the affirmation by asking repeated questions securing [the child's] promise to tell the truth"); *United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (affirming that Rule 603 was satisfied

where district court simply asked the child "Do you promise me that in response to Mr. Vinegrad's [the prosecutor] questions and in response to any questions that Mr. Meyerson [defense counsel] asks, do you promise me that you will tell the truth?"); *United States v. Elsevier*, 2002 WL 243445, at *4 (N-M. Ct. Crim. App. Feb. 19, 2002) (finding military Rule 603 equivalent satisfied where child stated that the truth is "what really happened" and "if you're lying you can get in real much trouble because they can tell").[5]

During the testimony of the child, the United States also requests that the Court require the parties to not make loud pronouncements of their objections while the child is on the stand. This may be very frightening to the child and she may shut down in the presence of such outbursts. Instead, the United States requests that the parties be required to simply state "your honor" audibly but not loudly, then calmly cite the rule of evidence or basis on which the objection is based.

### ii. Age Appropriate Questioning

Also pursuant to Fed. R. Evid. 611(a), the Court may instruct counsel to refrain from questions that are confusing, misleading, ambiguous or unintelligible. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (court may place reasonable

---

[5] As far back as *Wheeler v. United States*, 159 U.S. 523, 525, (1895), courts have recognized the need to accommodate child witnesses. In *Wheeler*, a five-year-old boy adequately made clear that he understood the obligation of the oath when, after a child friendly voir dire, upon being asked what the meaning of the clerk's oath just read to him meant, he replied, "Don't you tell no story."

limits on cross-examination based on harassment, prejudice, confusion of issues, witness's safety, repetitive, or marginally relevant questions).

The United States submits that when a child is frightened, especially by counsel who is sitting next to an individual who has sexually abused her, it may inhibit her ability to recall facts and testify truthfully.  If a child simply shuts down on the witness stand, that can actually harm the defendant and leave an impression on the jury about the defendant's culpability.  It is therefore in the best interest of all parties involved that the child in this case be asked questions that are not suggestive and that are not intimidating. ALLIE PHILLIPS & SUSANNE WALTERS, NAT'L DIST. ATTORNEYS ASS'N, A COURTROOM FOR ALL: CREATING CHILD- AND ADOLESCENT-FAIR COURTROOMS 10 (2013).

The United States requests that this Court instruct counsel to refrain from unduly embarrassing questions with marginal relevance. *See Alford v. United States*, 282 U.S. 687, 694 (1931) (the trial judge should protect the witness from questions which "go beyond the bounds of *proper* cross-examination merely to harass, annoy or humiliate.")

The United States also requests that the defense be required to ask simple, age-appropriate questions. In other words, the United States requests that counsel be prohibited from asking questions that are suggestive. While Rule 611 allows for leading questions on cross examination, the Court may still limit such suggestive

questioning techniques when certain types of witnesses, such as child witnesses, are being cross-examined. "The purpose of the qualification 'ordinarily' is to furnish a basis for denying the use of leading questions" under certain circumstances. Fed. R. Evid. 611(c) advisory committee's note c (1972).  A young child might rather agree with an overly suggestive and/or aggressive question than disagree with an adult in a room full of strangers, regardless of the truth of the response. Such cross examination methods will not achieve the desired result of achieving justice through the presentation of the truth. Because the goal of trial is to get to the truth, the United States submits that the Court should strictly limit the number of leading questions by the defense in cross-examination of the young child in this case.

### iii.  Witness Chair Location

The United States respectfully requests that the 12-year-old juvenile victim in this case, M.C., be permitted to testify from a location in the courtroom that is not the standard witness box. The configuration of the courtroom places the witness less than 6 feet away from the table where Defendant will be seated. The United States submits that Defendant's Confrontation Clause right can still be fulfilled if M.C. is permitted to testify from a location in the courtroom that makes her feel more comfortable and less anxious about being in such close proximity to the man who sexually abused her when she was such a small child.

Victims often feel apprehension and fear over testifying in court. In this case, the courtroom encounter with the defendant will be the first time the victim has seen Defendant since the sexual assaults last occurred in 2008. The trial itself creates added pressure and stress on the victim, with the verdict affecting whether the victim obtains justice and future safety. Additionally, while speaking in public to strangers is always stressful, it is even more challenging for victims who are discussing what is often the most traumatizing event of their lives. All of these concerns coupled with cross-examination by a skilled defense lawyer such as Ms. Barnett, whom the victim knows intends to attack her credibility and memory, can be an overwhelming experience for this child victim. There is no need to further traumatize her by seating the defendant within 6 feet of the witness box. This Court has discretion to accommodate the victim so that Defendant is not so close to her when she testifies.

In *Maryland v. Craig*, the Supreme Court of United States held that the Sixth Amendment's Confrontation Clause does not "guarantee[] criminal defendants the absolute right to a face-to-face meeting with witnesses against them at trial." *Maryland v. Craig*, 497 U.S. 836, 844 (1990). The Court found, instead, that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id*. at 850. The Court found that the

Confrontation Clause ensures the reliability of testimony because it (1) ensures that the witness will give his or her statements under oath, (2) forces the witness to submit to cross-examination, and (3) allows the trier of fact to observe the witness's demeanor. *Id*. at 845-46. The Court further found that "the protection of minor victims of sex crimes from further trauma and embarrassment" is a compelling government interest that, in some cases, "may be sufficiently important to outweigh a defendant's right to face his accusers in court." *Id*. at 852-53. The Court concluded that "if a State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." *Id*. at 855.

Victims of crimes have been afforded certain rights under the Crime Victim's Rights Act, 18 U.S.C. § 3771, *et. seq.* Among those rights are the following:

> **§ 3771. Crime victims' rights**
> **(a) Rights of crime victims.**--A crime victim has the following rights:
>     **(1)** The right to be reasonably protected from the accused.
>     . . .
>     **(8)** The right to be treated with fairness and with respect for the victim's dignity and privacy.
> **(b) Rights afforded.**--
>     **(1) In general.**--In any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a). . . . The reasons for any decision denying relief under this chapter shall be clearly stated on the record.

18 U.S.C. § 3771.

The Supreme Court's reasoning in *Maryland v. Craig*, coupled with the victim's rights as codified in § 3771, make it clear that the Sixth Amendment right of confrontation does not require the defendant to sit within a distance of 6 feet of people who say that the defendant sexually assaulted them. Nor does the right of confrontation require the victim to be staring at the defendant during testimony. For example, both counsel tables would still have clear views of the witness chair if it were located in the well between the podium and the judge, or in the unused witness box between the jury and the judge. There will be no interference with the defendant's ability to hear or see the witness, or with the witness's ability to hear and see the defendant. In short, the defendant is entitled to see and hear the witness, not physically intimidate her.

Other courts have permitted similar relocation of witness chairs for child witnesses without finding a Confrontation Clause violation. For example, in *United States v. Williams*, 37 M.J. 289, 289 (C.M.A. 1993), one child witness testified from the normal witness stand, while another testified from a chair in the center of the courtroom. The child was seated outside the witness box, facing the judge, with the defendant's table to the left of the chair so that the defendant could "see the witness against him while allowing [the child] to feel less inhibited than if she were facing her father." The appeals court affirmed, finding no violation of the Confrontation

Clause. *See also Brandon v. State*, 839 P.2d 400, 409-410 (Alaska Ct. App. 1992) (holding victim seated perpendicular to defendant did not violate the defendant's right to confrontation); *Stanger v. State*, 545 N.E.2d 1105, 1114 (Ind. Ct. App. 1989) (holding where victim seated at angle toward jury and away from the defendant did not violate right to confrontation) (overruled on other grounds).

### G. Character Evidence

Rule 405(a) of the Federal Rules of Evidence provides that:

> When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion.  On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct.

Further, "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) (affirming exclusion of defendant's proffered testimony of prior acts of good conduct for the purpose of negating the issues of intent and opportunity under Rule 404(b) because it was "merely an attempt to portray [the defendant] as a good character through the use of prior 'good acts' " and was thus inadmissible character evidence); *see also United States v. Hudson*, 2011 WL 5331701 (E.D. La. Nov. 7, 2011) (granting government's *in limine* excluding defendant's proffered evidence of military service).

**IV.    Exhibit List**

In accordance with the Court's trial Order (Doc. No. 80), the United States has provided opposing counsel with a list of exhibits that it anticipates using at trial, including any summaries, under separate cover. The United States will provide the Court and opposing counsel with a final list of exhibits under separate cover.

Respectfully submitted on this the 30th day of November 2015.

> JOYCE WHITE VANCE
> United States Attorney
>
>
> */s/ Jacquelyn M. Hutzell*
> JACQUELYN M. HUTZELL
> Assistant United States Attorney
>
>
> */s/ Austin M. Berry*
> Austin M. Berry
> Trial Attorney

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the foregoing was filed Monday, November 30, 2015 via CM/ECF, which will cause a copy to be sent to Defendant's Attorneys.


*/s/ Austin M. Berry*
AUSTIN M. BERRY
Trial Attorney