FILED

2015 Dec-03  PM 05:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## <u>EASTERN DIVISION</u>

**UNITED STATES OF AMERICA**

**VS.**                                      **CASE NO. 1:14-cr-333-AKK-JEO**

**RICK LEE EVANS**

## <u>UNITED STATES' CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS IN LIMINE FILED ON NOVEMBER 19 & 30, 2015</u>

On November 19, 2015, in response to this Court's directive to file a response to the United States' Rule 414/404(b) *in limine* which was filed on July 29, 2015 (Doc. No. 82), Defendant filed three motions *in limine* (Doc Nos. 144, 145, & 146). On November 30, 2015, Defendant filed eleven motions *in limine* seeking to exclude essentially everything the United States intends to introduce, including the child victim's testimony on the frivolous grounds that it is not "based on personal knowledge." (*See* Doc. No. 171.) Below is the United States' consolidated response to Defendant's motions that were filed on November 19th and November 30th.[1]

### I.     <u>Child Development Center (Doc. No. 144) & Touch Policy (Doc. No. 146)</u>

In Defendant's *in limine* titled "Child Development Center," he argues that

---

[1] On November 22, 2015, the United States responded to one of the three (Doc. No. 145) that were filed on November 19th. That response by the United States can be located at Doc. No. 148.

the United States should be precluded from even mentioning the undisputed fact that Defendant was employed by two childcare facilities operated by the Department of Defense. Defendant argues that "the only purpose of admitting such evidence would be to cause unfair prejudice against Mr. Evans by implying to the jury that his employment was somehow nefarious, thereby asking the jury to infer that he must have sexually molested M.C." (Doc. No. 144 at 1.) The United States has never indicated that it intends to use the mere fact of employment in childcare to imply anything related to the underlying charges. Instead, the United States has argued that certain incidents that qualify as admissible evidence under Federal Rules of Evidence 414 and 404(b) occurred at those childcare facilities. (*See* Doc. No. 82.) If this Court grants the United States' request to introduce facts about those incidents, then his employment there will necessarily be part of that presentation of evidence.

Regardless of whether evidence of those incidents are admitted at trial, there is no reason to exclude the fact of his employment at the childcare facilities. Indeed, although the Indictment states that he began working there in July 2009, that is imprecise. He actually began working in some capacity at the Child, Youth & School Services in November 2008, while M.C. was still living with Defendant.[2] In fact,

---

[2] Defendant tacitly acknowledges this fact, as he must, because the incidents that form the basis for the Rule 414/404(b) evidence occurred in April and May 2009. He was hired to a full-time position (hence the signing of the Touch Policy) on July 2, 2009. (*See* Doc. No. 146 at 3 n.2-3.)

Defendant signed an "Application for Respite Caregivers" in April 2009 in which he listed November 1, 2008, as his first date of employment with CYS, along with his "age preference" of "4 years and up." Thus, his employment, at least for that short period of time at the end of her stay with him, is part of the time period charged in the Indictment. To the extent Defendant's estranged wife testifies that sometimes Defendant worked the Parent's Night Out events and took M.C. with him on occasion, that is simply part of the story of their interactions with each other. There is nothing prejudicial about that fact, much less so unfairly prejudicial that it outweighs the probative value of explaining to the jury the closeness of the bond between M.C. and Defendant.

Defendant additionally argues that Paragraph 1(c) of the Indictment should be stricken as surplusage. While the United States disagrees with Defendant's assertion that its inclusion in the Indictment is to "poison the jury against" him, the United States does not object to striking that paragraph. Its inclusion is not an element of the offense.

In a related filing, "Touch Policy" (Doc. No. 146), Defendant argues that the United States should be precluded from arguing that Defendant violated the "Touch Policy" at the daycare where he worked. Defendant's primary argument is that he did not technically violate the "Touch Policy," so the United States should not be

3

allowed to say that he did. The United States does not disagree that the Touch Policy, pasted verbatim into Defendant's brief, permits a child sitting on his lap. To the extent the United States has previously referenced this Touch Policy as something that Defendant violated, it now abandons any such assertion.

As undersigned counsel argued to this Court on October 16, 2015, the existence of the policy is not relevant to the United States' argument about the incidents that it seeks to admit at trial. Indeed, the witnesses the United States intends to call at trial would describe the acts committed by Defendant in such a way that even the witnesses will declare that what Defendant was doing was well beyond their own interpretation of what "sitting on lap" means. In other words, it is the acts themselves that the United States believes qualifies as evidence admissible under Rule 414 or 404(b), not any technical violation of the policy. Indeed, if permitted to introduce this evidence, the United States has no intention of even referencing the Touch Policy, but fully expects Defendant to offer the policy in defense or mitigation of what the witnesses will describe him as having done. That is, the United States agrees not to mention the Touch Policy.

Defendant next argues that the substantive acts he committed against other children at the daycare that the United States intends to introduce cannot be admitted because they do not qualify under Rule 414 or 404(b). The United States believes

this issue has been adequately briefed for the Court, and directs the Court's attention to Doc. No. 82 for the United States' substantive argument on these incidents.

## II.   Prior Statements of M.C. (Doc. No. 163)

In Defendant's *in limine* titled "Prior Statements of M.C.," he argues that the United States should not be permitted to introduce the juvenile victim's statements that she made on video during the two interviews in 2009, namely Exhibits 2-20 (video clips) and Exhibits 21-22 (drawings created by M.C. during the respective interviews). The United States submits that this issue has been adequately briefed in its own filing, found at Doc. No. 160.

## III.   Testimony of Johnathan Bridbord (Doc. No. 164) & Forensic Report (Cookies & Thumbnails) (Doc. No. 165)

In Defendant's *in limine* titled "Motion in Limine to Exclude Testimony of Johnathan Bridbord," he argues that the United States' expert should be excluded on the grounds that the expert does not have personal knowledge and that the expert is testifying about testimonial statements of non-testifying German witnesses. Specifically, Defendant argues that the "forensic reports in this case are testimonial" and therefore they cannot be introduced by anyone other than the German law enforcement agents who examined the original devices. Similarly, in Defendant's *in limine* titled "Forensic Report (Cookies & Thumbnails)," he argues that the United States' proposed exhibits, Exhibit 45 (cookies) and 46 (thumbnails), come from the

German forensic "reports" such that they are testimonial and cannot be admitted.

Defendant misses the mark because he has conflated the narrative reports of German law enforcement with the automatically generated data extraction reports by the software applications. That is, the German forensic examiners used commercially available software, specifically FTK and EnCase, to extract photos, videos, and other data (e.g., website history known as cookies) from the devices located in Defendant's residence. Those software applications create "reports" that contain raw, derivative evidence and metadata indicating where data was located on the source device and when it was created, modified and accessed. Put differently, FTK and EnCase automatically generate a "report" that simply contains the photos, videos, and cookies located on the devices. There is no analysis involved or opinions generated by FTK and EnCase. By contrast, the German forensic examiners then took that data and wrote *narrative* reports summarizing the vast amount of data extracted by FTK and EnCase.

The United States agrees that the statements by the examiner summarizing the data extracted from Defendant's devices cannot be introduced into evidence. But the United States is not trying to introduce such statements. In one report, located at Bates 38-43[3], Mr. Geist, a German law enforcement forensic examiner, summarized

_____

3 Bates 37-68 encompasses the English translation of all of the forensic examination narrative

6

the most salient data extracted from Defendant's devices. For example, he did so in narrative form by explaining that there were a certain number of log-ons from the "Susan Evans" account and "Rick Evans" account. Similarly, Geist explained that he located 211,911 image files. The United States agrees that the Geist reports are not admissible because Geist is unavailable to testify and the defense has not had a chance to cross-examine him. But the United States has never suggested that Geist's narrative reports would be offered.

Instead, the United States intends to offer the extracted data from Defendant's devices, **<u>not</u>** Geist (or anyone else's) out-of-court statements *about* that data. The data itself is not testimonial. It is raw data that was extracted from a machine, i.e., the electronic devices. There is no analysis necessary about this data. It speaks for itself. In other words, the cookies, photos (full resolution and thumbnails), and videos extracted from Defendant's devices are unanalyzed raw data that is not testimonial. The fact that the commercially available software applications, FTK and EnCase, compiled this extracted data into a navigable format referred to as a "report" does not make that data testimonial. Because that raw data is not testimonial, it cannot violate the Confrontation Clause to introduce it through Mr. Bridbord.

---

reports generated by German law enforcement personnel, such as Geist. None of these reports will be offered as evidence.

Indeed, Mr. Bridbord's sole function is to help provide an adequate foundation for the introduction of that raw data under Federal Rule of Evidence 901(b)(4). In other words, Mr. Bridbord's testimony is not about the analysis done by Geist or any other forensic examiner, but instead is about the contents of the devices themselves, namely the photos, videos, cookies, and folders in which they are located. Mr. Bridbord's expertise regarding electronic devices and the software tools used to extract such data will aid the Court in making the threshold determination that the evidence (photos, videos, cookies, etc.) are what the United States purports them to be: data from devices that were in Defendant's residence in Germany in 2009.

Furthermore, to the extent Defendant complains that the original evidence was destroyed by the Germans, Mr. Bridbord can explain how FTK and EnCase extract data in a bit-for-bit format that is identical to its form on the original device. Indeed, Mr. Bridbord will likely explain that good practice for a forensic examiner is to *never* perform an extraction on an original device, but instead to create a forensic image, or duplicate, of the original device, and then run FTK and EnCase on those duplicate devices, which themselves are bit-for-bit copies of the original. In other words, the photos, videos, and cookies that the United States seeks to admit are exactly the same as it would seek to admit if the German forensic examiner were available to testify: machine-generated data from a copy of the original evidence. Mr. Bridbord can

explain that duplication process, and how it is automated by FTK and EnCase.

To the extent Defendant argues that the Supreme Court's decisions in *Melendez–Diaz* and *Bullcoming* are controlling, he misreads those cases. Those cases each involved one or more absent expert's "certification" with respect to the meaning of the underlying raw data, and no such certification is at issue here. *See United States v. Summers*, 666 F.3d 192, 203 (4th Cir. 2011) (discussing limits of *Melendez–Diaz* and *Bullcoming*). Instead, the data analyzed by Mr. Bridbord, which is the data the United States seeks to introduce, is machine-generated data (photos, videos, and cookies) extracted from one device (Defendant's various electronic devices, e.g., laptop, USB, external) to another device (CDs/DVDs provided to the United States by the Germans).

Since *Bullcoming*, numerous courts have recognized the limits of its holding by finding that certain types of evidence are machine-generated and thus not testimonial. For example, in *United States v. Katso*, the court held that the DNA profiles created from samples of blood, saliva, and semen are machine-generated data. *United States v. Katso*, 74 M.J. 273, 277 (C.A.A.F. 2015). It was only the comparison of the different profiles generated by the machine that qualified as analysis and thus testimonial statements. *See also Paredes v. State*, 462 S.W.3d 510, 519 (Tex. Crim. App. 2015) (holding that DNA profiles were "raw, computer-

generated data that the capillary electrophoresis instrument produced" and thus not testimonial and not violative of the Confrontation Clause as interpreted by *Bullcoming*); *United States v. Drayton*, 2014 WL 2919792, at *10 (D. Md. June 26, 2014) *aff'd*, 589 F. App'x 153 (4th Cir. 2015) ("[Prosecution expert] was presented with machine-generated toxicology data and gave his opinion interpreting that data."); *People v. Lopez*, 286 P.3d 469, 478 (Calif. 2012) (relying on federal circuit opinions and holding that laboratory report's pages consisting "entirely of data generated by a gas chromatography machine to measure calibrations, quality control, and the concentration of alcohol in a blood sample" did not violate *Bullcoming* or the Confrontation Clause because they were machine-generated).

This is similar to the instant case. The German forensic examiner's report containing summary of the data from the devices is testimonial, but the data itself is not a statement. Mr. Bridbord is not a "surrogate" expert, *Bullcoming,* 131 S. Ct. at 2715, analyzing testimonial statements of another person. *See Katso*, 74 M.J. at 275. He is analyzing machine-generated data: the cookies, photos, and videos (and their respective meta-data).

In addition to the Confrontation Clause argument, Defendant argues that the thumbnails and cookies "do not have sufficient probative value." Defendant's cramped view of what qualifies as probative is curious. Defendant has asserted that

he did not know the child pornography was on his devices. The United States intends to demonstrate his knowledge in a variety of ways, such as those outlined in a related filing (Doc. No. 148). In addition, the thousand-plus thumbnails of seemingly innocent activity, including photos of M.C., Defendant, his wife, and their family, as well as photos of children at the daycare, all combine to demonstrate that these devices are from Defendant's residence. In other words, the photo documentation of their daily life will help the jury conclude that these devices are what the United States claims. Indeed, the non-criminal contents of the computer are highly probative of the United States' theory that the computer was in Defendant's residence and used by Defendant. If Defendant wants to stipulate that these devices were in his residence and that he knew the child pornography was on them, then the United States is more than happy to take Exhibits 45 and 46 off the list. Assuming he is not inclined to such a stipulation, however, the United States needs to be able to demonstrate to the jury that these computers were in fact used by Defendant and the existence of cookies under the Rick Evans profile and thumbnails of innocent activity in the same folder as thumbnails of pornographic material is highly probative of the fact that Defendant did in fact utilize those computer devices.

The fact that Defendant has some alternative theory does not diminish the threshold determination of probative value. Indeed, the United States fully

anticipates that Defendant will attempt to place evidence or argument in front of the jury that creates a plausible alternative explanation for the existence of the child pornography and cookies of pornographic websites visited. Apparently, he plans to blame his wife as the one who did all the internet surfing of porn. Defendant should be permitted that latitude to pursue such an alternative theory, but having a plausible explanation does not negate or even diminish the United States' theory. It simply goes to the weight of the evidence, not its admissibility. Accordingly, Defendant's *in limines* (Doc. Nos. 164 and 165) should be denied.

### IV.   Underwear (Doc. No. 166)

In Defendant's *in limine* titled "Motion in Limine and Objection to Government's Motion in Limine – Underwear," Defendant argues that the United States should not be permitted to introduce evidence of Defendant's admitted 30-year collection of panties of girls and women. The United States submits that its filing, located at Doc. No. 150, largely addresses this issue, but some clarification is warranted. Specifically, Defendant takes issue with the characterization of the recorded jail call between Defendant and his then-girlfriend, in which the United States represented that the girlfriend described the panties as "teeny tiny ones." That was a mistake. Undersigned counsel genuinely thought that is what she said, but upon reading Defendant's complaint, multiple listenings of the recording reveals that

she said "little, little, little sizes," not "teeny tiny ones."[4]

Defendant conspicuously omitted his own understanding of what she said in his filing, instead simply complaining that "[t]he girlfriend does not use this term [teeny tiny] in the call." That omission is telling because, the United States submits, the substance of what she said was essentially the same as originally related. In other words, it is a distinction without a difference: She was relating the fact that she observed panties that were very small and thus belonging to small girls. Ultimately, the jury should be allowed to listen to the calls to assess for itself what was said and Defendant's response to it.

In addition, to the extent Defendant argues that expert testimony is required to explain to the jury why Defendant would collect panties of girls and women, there is no such requirement or need. The jury can reasonably infer that a man who collects the panties of females is sexually attracted to females. It does not take a psychologist to explain that to the jury. The jury can reasonably infer that a man who collects the panties of females is doing so for a sexual purpose. It does not take a psychologist to explain that to the jury. Similarly, the jury can infer that a grown man who collects little girls' panties is likely sexually attracted to young girls. In fact, on December 2,

---

4 For what it is worth, undersigned counsel has difficulty hearing and wears hearing aids to try to combat that deficit. The other participant to the phone call, Defendant's then-girlfriend, will be in the best position to tell the jury what she said in that call.

13

2015, the United States obtained another letter written by Defendant and sent to his then-girlfriend shortly after the jail call in question, in which Defendant states, "[a]s for the Ziplock [sic] baggies you found, that was the results [sic] of a fetish from my younger days." In other words, an expert is not necessary to explain to the jury that Defendant's purpose for collecting the panties was sexual because Defendant explained it himself by calling it a fetish. Of course, that makes sense in this case where a prepubescent female has accused him of sexually abusing her in a house where he stored child pornography. The probative value is patent.

To the extent Defendant has an innocent explanation for stealing the "little, little, little sizes" of panties of girls, he is equally free to submit that theory to the jury either through the introduction of evidence (testimonial or otherwise) or through jury argument during closings. Similarly, to the extent Defendant believes that the proportion of "little, little, little sizes" of panties of girls was small in comparison to the number of adult women's underwear, he is also free to explain that to the jury. Indeed, perhaps he will argue that he also collected men's underwear and little boys' underwear, though there is no evidence of such. At that time, perhaps he can also explain why he was so willing to have his girlfriend assist in the destruction of that evidence, especially after having committed 30 years to collecting them.

In other words, the United States is not suggesting that there is only one theory

14

of why Defendant possessed these three bags full of panties. The United States should be permitted to present all available facts to the jury to determine whether they believe he committed the charged crime. Likewise, Defendant should be permitted to explain why the United States' theory is erroneous. Trials are supposed to be truth-seeking events. Defendant's argument rests primarily on his concern that the truth will be too obvious if the jury is fully aware of all the facts. Accordingly, the United States submits that Defendant's collection of "little, little, little sizes" of girls' panties is something the jury would like to know in determining whether M.C. is fabricating stories about Defendant's sexual abuse of her when she was 5 years old. More importantly, the collection of panties goes to Defendant's intent to sexually abuse M.C., i.e., his sexual interest in her.

## V.   **Jail Letters (Doc. No. 167)**

In Defendant's *in limine* titled "Mr. Evans's Motion in Limine to Exclude Letters From the Calhoun County Jail," Defendant argues that the letters he wrote to his girlfriend should be excluded pursuant to Federal Rules of Evidence 410 and 402. Neither is a basis to exclude Defendant's letters.

First, Federal Rule of Evidence 410 provides in relevant part:

(a) Prohibited Uses. In a civil or criminal case, evidence of the following is not admissible against the defendant who made the plea or participated in the plea discussions: . . . (4) a statement made during plea discussions **with an attorney for the prosecuting authority** if the

discussions did not result in a guilty plea or they resulted in a later-
withdrawn guilty plea.

Fed. R. Evid. 410 (emphasis added). Rule 410 does not exclude Defendant's
statements to his girlfriend about considering a plea. *See United States v. Mejia*, 655
F.3d 126 (2011) (discussed *infra*); *Bowman v. Ryan*, 2015 WL 4571567, at *5 (D.
Ariz. July 28, 2015) (denying habeas relief based in part on trial court's admission
of defendant's letters from jail discussing possible guilty plea); *United States v.
Reed*, 2012 WL 928259, at *2 (E.D.N.Y. Mar. 19, 2012) (admitting United States'
request to admit jail calls of defendant saying that others needed to stay quiet so that
they all could get a "better plea offer"); *United States v. Kearns*, 109 F. Supp. 2d
1309, 1315 (D. Kan. 2000) (letter from defendant in jail to police officer was not
statement in the course of plea negotiations).

In *United States v. Mejia*, the Second Circuit affirmed the admission of
Defendant's statements to his sister in a recorded jail call about his willingness to
plea. *Mejia*, 655 F.3d at 135. There, the defendant asked his sister to have his brother
inform his lawyer that he wanted to discuss whether he should plead before the
indictment. *Id.* at 129. He told her that another inmate had told him it was best to
plead before an indictment and that the effect would be to decrease his sentence. *Id.*
He said, "let's suppose, if I plead guilty to that complaint ... that's five–to–40 [years]
... so, it turns out to be just five years, a little over three years." *Id.* He went on to tell

16

his sister "to call the lawyer and tell him to, to call the prosecutor ... [and] say that I wanna plead guilty to the complaint, that I accept the five–to–40." *Id.*

The Second Circuit found that the language of Rule 410 obviously "excludes as inadmissible 'any statement made in the course of plea discussions *with an attorney for the prosecuting authority* which do[es] not result in a plea of guilty or which result[s] in a plea of guilty later withdrawn.'" *Id.* at 135 (citing Fed. R. Evid. 410(4)) (emphasis in original). As such, the court found it "[did] not apply to [the defendant's] situation, where he expressed his desire to plead guilty to his sister." *Id.* at 135 (citing *United States v. Barrow*, 400 F.3d 109, 116 (2d Cir.2005)).

The relevant facts of *Mejia* are virtually identical to those in the instant matter. Here, Defendant, in handwritten letters to his girlfriend, repeatedly explained his current state of thinking about his inclination to plead guilty. Rule 410 clearly only excludes statements made to the prosecuting authority in the course of plea negotiations and does not exclude statements made about consideration of a plea to third parties, like a sister or, in this case, his girlfriend. The United States fully intends to elicit from Defendant's girlfriend the fact that Defendant never admitted his guilt to her, and in fact protested his guilt. Defendant is free to emphasize such facts in countering his statements of willingness to plead guilty. Similarly, Defendant is free to testify that he only intended to plead guilty if the offer was

17

sufficiently low, so long as he does not run afoul of this Court's anticipated ruling

prohibiting reference to the specific amount of punishment applicable in this case.

(*See* Govt's In Limine to Exclude Reference to Punishment, Doc. No. 162.)

Second, Rule 402 stands for the general proposition that "[r]elevant evidence

is admissible." Fed. R. Evid. 402. The relevance of the letters is briefly laid out in

the chart below:

| Exhibit | Content | Relevance |
|---------|---------|-----------|
| Jail call January 5, 2015 20:11 | Beginning to 00:28 & 09:40 to end – Discussion of stealing girls' panties from community laundry for 30 years | See Doc. 150. |
| Jail call January 5, 2015 20:36 | Beginning to 03:13 – Continuation of discussion of stealing girls' panties from community laundry for 30 years | See Doc. 150. |
| Jail letter – B1479[5] | "As far as the Ziplock baggies you found that was the results of a fetish from my younger days. But you know how I hate to get rid of my past." | See Section IV, *supra*, and Doc. 150. |
| Jail letter – B1453-1454 | "Yes, I paid a fine in Germany, but I was told it was for illegal downloads and Susan and I both thought it was for my downloading TV | Contradicts anticipated testimony by Susan Evans that Defendant knew his conviction was for child pornography; limits |

---

[5] This is one of the letters that the United States received late in the afternoon of December 2, 2015, thus it was not originally identified as an exhibit because its existence was not known to the United States at the time the exhibit list was disclosed. The United States provided the letters to Defendant's attorneys within 3 hours of receiving them on December 2, 2015.

| | | |
|---|---|---|
| | shows and movies via rapidshare." | Defendant's defensive theory ("some other dude did it"); and corroborates victim's statements that she watched movies on his computer with him |
| Jail letter – B1499-1500 | "I finished my 'Rick's Bucket List' last night. Now to work on my 'Rick's Adult Bucket List.' That should be quite interesting. And a little scary because you will find out just how freaky I am." "I really hope my 'Rick's Adult Bucket List' doesn't scare you away. I think it's all legal." | Corroborates artifacts on electronic devices, namely the "Ricks Adult" naming convention for one of the folders on his USB device that contained child pornography. |
| Jail letter – B1505-1507 | "What it all boils down to is a child's word that has changed her story about events each interview. Other than to say Mr. Rick taught me about sex….I treated her as my own. Taught her to do things on her own by making her do them but talking her through it. An example would be doing puzzles. I would take her through puzzles but she had to do it." | Corroborates potential testimony from M.C. |
| Jail letter – B1509 | Entire page. | Consciousness of guilt |
| Jail letter – B1513-1514 | "I have talked to God on all this and I am down to only 2 choices. I know I am not meant to go to jail for life. I know that is not God's plan for me. So know that isn't even an option to me. He is | Consciousness of guilt |

| | | |
|---|---|---|
| | either going to set me free with a dismissal motion or he is going to have me take a plea." "I do want you to know that I am not doing anything until after the motions hearing. If God wants me to go free then that is when he'll do it. If not, I'll accept that he has a reason for me to go to prison and work on a plea deal." | |
| Jail letter – B1515-1520 | "She [Susan] hated sex and I loved it." | Corroborates potential testimony from M.C. |
| Jail letter – B1525-1528 | "Lust is also a sin I am highly guilty of." | Consciousness of guilt |
| Jail Letter – B1463[6] | "LSD stands for <u>Lust</u> which is <u>Sin</u> which leads to <u>Death</u> (LSD). I know I have been guilty of this in the past. I never really thought of the effects of Lust on myself or those around me." | Consciousness of guilt |
| Jail letter – B1529-1532 | "With that said, 3 weeks ago I had no intention of taking the plea deal. Today with a few more questions pending I am 85% sure I'm going to take the plea. If I get the answers I think I will get next week I'm 100% sure I'll take the plea deal." | Consciousness of guilt |
| Jail letter – B1533-1544 | "It's not official yet but I have pretty much taken the plea | Consciousness of guilt. |

---

[6] This is one of the letters that the United States received late in the afternoon of December 2, 2015, thus it was not originally identified as an exhibit because its existence was not known to the United States at the time the exhibit list was disclosed. The United States provided the letters to Defendant's attorneys within 3 hours of receiving them on December 2, 2015.

| | | |
|---|---|---|
| | deal." "There are a lot of classes I will have to take….The one that is most important to me is any and all anger management classes I can take." "I know I want to work on my anger management issues." "There is going to be one issue that may blow all of this off track….The one I do have issue with is a test that they put electrodes on the Cub and show images to see how the Cub reacts. That I will not agree to. I find it humiliating and honestly totally ineffective. What if I see something that reminds me of something you and I did? It's not the image they are showing causing the reaction but rather the thought of times past." | |

Because Defendant's letters are relevant and not excluded pursuant to Rule 410, they are admissible.[7]

---

[7] Absent, of course, a finding that their value is *substantially* outweighed by a danger of unfair prejudice, pursuant to Rule 403.

## VI.    **Grandmother's Statements (Doc. No. 169)**

In Defendant's *in limine* titled "Statements of [M.C.'s Grandmother]" he argues that the United States should not be permitted to introduce M.C.'s statements that she made to her now-deceased grandmother. The United States submits that this issue has been adequately briefed in its own filing, found at Doc. No. 160, in particular pages seven through eighteen.[8]

## VII.   **Testimony of M.C. (Doc. No. 171)**

In Defendant's *in limine* titled "Testimony of Complaining Witness," he regurgitates his plaintive cry from a previous filing (Doc. No. 131) in which he demands a pretrial hearing on the "reliability" of M.C. On November 16, 2015, this Court, in an oral order during a telephone conference, denied Defendant's request. As this Court pointed out, trial is the place to test M.C.'s credibility. This Court has rightly concluded that it is not the place of the judge to make such credibility assessments in advance of trial.

---

[8] While the United States' motion was filed prior to Defendant's Motion *in Limine* regarding the statements of M.C.'s grandmother, they were filed the same day and Defendant's motion was clearly written without the knowledge of what exactly the United States would propose to introduce. This being said, the United States is only seeking to introduce *M.C.'s* statements to her grandmother. As stated in Document 160, there is no Confrontation Clause issue because M.C. is testifying and Defendant will have an opportunity to cross-examine her. Furthermore, as demonstrated in *Ohio v. Clark*, 135 S. Ct. 2173 (2015), M.C.'s statements to her grandmother were not testimonial because of M.C.'s age, the fact that her primary purpose in making the statements to her grandmother was clearly not to create evidence for Defendant's prosecution, the conversation was informal and spontaneous, and the setting was informal.

### VIII. Uncharged Conduct (Doc. No 173), Sexual Devices (Doc. No. 168), and Dogs (Doc. No. 172)

Defendant's Motions in Limine, Uncharged Conduct (Doc. No. 173), Alleged Sexual Devices (Doc. No. 168), and Dogs (Doc. No. 172), should all be denied.   In those motions, Defendant moved to exclude the following evidence: 1) Defendant clapped while M.C. danced naked for him; 2) Defendant showed M.C. his sex toys; 3) Defendant showed M.C. pornography; 4) Defendant had M.C. smell his semen; 5) Defendant's sex toys, specifically proposed Government's Exhibits 23 and 24; and 6) Defendant fed his semen to his dogs in front of M.C. In short, Defendant argues that all of this evidence should be excluded because it is irrelevant, not probative, and unfairly prejudicial.

Evidence of Defendant's sexualized relationship with M.C. is clearly relevant and probative and is not *substantially outweighed* by any unfair prejudice in Defendant's trial for aggravated sexual abuse of M.C. However, this evidence is not only relevant and probative to prove the sexualized nature of Defendant's interactions with M.C. For example, the fact that M.C. danced naked for Defendant while he applauded contradicts his assertion that he never interacted with M.C. in an inappropriate manner, like bathing her.[9] (Bates 313.) Moreover, Defendant has

---

9 "Every other night was bath night. Susan would get her situated in the tub and give her 15-30 minutes to play depending on how late it was. Then she would go in get her hair washed, get her out, dry her off, cake her with lotion and put her pajamas on." (Def's typed statement, Sept. 21,

made clear that his defense strategy is to attack the credibility and reliability of

M.C. [10] Evidence that Defendant showed M.C. his sex toys and pornography,

Defendant fed his semen to his dogs in front of M.C., and that Defendant had sex

toys, pornography, and two dogs corroborates the testimony of a child who

Defendant regularly accuses of being unreliable and not credible. This evidence is

---

2010).

[10] See the various allegations made by Defendant over the course of motions practice in this case: "In November, 2009, M.C. was interviewed by Army CID. While M.C. again alleged that there was inappropriate sexual contact with Mr. Evans, *M.C. provided multiple inconsistent statements.*" (Doc. No. 30, "Mr. Evans' Second Motion to Dismiss.") "Mr. Evans would expect Ms. Otto-Lotz to testify that she is a forensic psychologist hired by the German prosecutor to analyze the two interviews of M.C. and that *based on the inconsistent statements*…Ms. Otto-Lotz believed that *M.C. statements were not reliable.*" (*Id.*) "Their testimony regarding the Touch Policy is exonerative of the alleged violation and is crucial to Mr. Evans' defense, especially considering the extraordinary impact that the 404(b) testimony has on a case where the only direct testimony linking Mr. Evans to the offense is *from M.C., whose credibility is extremely questionable.*" (*Id.*) "Ms. Otto-Lotz found that M.C.'s statements contained too many *inconsistencies* and uncorroborated information regarding other alleged 'victims' and 'witnesses,' to find M.C. reliable." (Doc. No. 36, "Mr. Evans' Third Motion to Dismiss – Compulsory Process.") "The allegations by M.C. have *changed* over time." (Doc. No. 38, "Mr. Evans' Fifth Motion to Dismiss – Lack of Specificity or, in the Alternative, Motion for a Bill of Particulars.") "M.C. could not tell how Mr. Evans allegedly taught her how to have sex and did not allege that Mr. Evans was the one that had her taste or smell the semen." (*Id.*) "But, these details *changed* in the August, 2014 interview." (*Id.*) "[T]hese *allegations vary* from the allegations made by M.C. to her step-grandmother." (*Id.*) "Defense counsel has filed multiple motions . . . highlighting M.C.'s *inconsistent* statements." (Doc. No. 94, "Emergency" Motion to Compel Production of *Brady* Material.) "Mr. Evans . . . cannot prepare for trial with multiple, *conflicting* accusations." (*Id.*) "M.C. had admitted that she *lied* about her allegations…" (*Id.*) "Defense cannot prepare its defense because . . . some of M.C.'s previously disclosed statements are *lies.*" (*Id.*) "M.C. will admit she *lied.*" (*Id.*) "[I]t is now highly possible that more suggestive discussions have taken place with M.C. to get her to *change* her story yet again." (*Id.*) "[T]he complaining witness continues to *change* her story." (Doc. No. 95, Motion to Compel Production of Grand Jury Transcripts.) "[A defense witness] will testify . . . that M.C. is '*not very credible.*'" (Doc. No. 100, Reply to Government's Opposition to Mr. Evans's Third Motion to Dismiss on Lack of Compulsory Process.) "M.C. is *not a reliable* witness because her memory has been *contaminated.*" (*Id.*) "[D]efense counsel has been unable to discern from her [M.C.] statements a consistent recitation of her allegations." (*Id.*) "The government has tainted their key witness." (*Id.*)

24

unequivocally relevant and probative.

Furthermore, Defendant's own expert testified that it is indeed these unique details from M.C. that are of significant importance in assessing her reliability. In fact, according to Defendant's own expert, all of these details that Defendant seeks to exclude are not only relevant and probative, but essential.

Q [Prosecutor]:  Right. What are the unique descriptions in the child's interview that stood out to you? Ms. Barnett went through with you all the things that were terrible about these interviews. Tell me what you -- unique is important to you, correct? Uniqueness of events, uniqueness of statements?

A [Esplin]:  Yeah, unusual details.

Q [Prosecutor]:  Right.

A [Esplin]:  Details that would be outside the common experience.

Q [Prosecutor]:  Tell me about those.

A [Esplin]:  The description of ejaculate from the -- the dogs; the description of how the ejaculate was disposed of; the understanding of dildoes; the amount of information that was sexually toned that would be quite infrequent for a child of that age in terms of even given sexting and so on on the Internet because she was young when she was reporting it; some understanding of sexual practices seemed that -- to be noteworthy; the gesture relative to masturbatory response that led to ejaculation would raise a question about how would she gain that knowledge -- were some that stood out.

25

Q [Prosecutor]:        Anything else?

A [Esplin]:        There was a lot of information that was troubling.
                   But those are the ones that come to mind that
                   jumped out. I'm sure there were some others.

Esplin Tr. 69:19 -70:16. Similarly, Esplin acknowledged that a sensory detail like the smell of the semen would likewise be important, although he personally found the child's description of the smell to be inaccurate. Regardless of his source of disagreement, he recognized the probative value of that type of detail. Thus, according to Defendant's own theory of the case, these very details are critical to give to the jury for them, the trier of fact, to make a proper assessment of M.C.'s credibility. As such, Defendant's Motions in Limine, Uncharged Conduct (Doc. 173), Alleged Sexual Devices (Doc. 168), and Dogs (Doc. 172), should all be denied.

## IX.   <u>Bestiality (Doc. No. 174)</u>

In Defendant's *in limine* titled "Bestiality," he argues that the evidence that he possessed videos of bestiality should be excluded. While it is true that he possessed numerous videos of horses aggressively penetrating adult women's vaginas, and videos of women fellating dogs, the United States has never referenced this material or even remotely suggested that it would be introduced at trial. The United States agrees that Defendant's interest in such material, while disturbing, is not sufficiently close to the charged conduct to make it probative. By contrast, the

child pornography evidence that depicts prepubescent children being sexually abused with sex toys is very similar to the charged conduct and thus highly probative. Accordingly, the United States is unopposed to Defendant's *in limine* Doc. No. 174, "Bestiality."

Respectfully submitted,

JOYCE WHITE VANCE
Unitted States Attorney


*/s/ Jacquelyn M. Hutzell*
JACQUELYN M. HUTZELL
Assistant United States Attorney


*/s/ Austin M. Berry*
Austin M. Berry
Trial Attorney

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the foregoing was filed Thursday, December 03, 2015 via CM/ECF, which will cause a copy to be sent to Defendant's Attorneys.

*/s/ Austin M. Berry*
AUSTIN M. BERRY
Trial Attorney

28