## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

**UNITED STATES OF AMERICA**

**VS.**                              **CASE NO. 1:14-cr-333-AKK-JEO**

**RICK LEE EVANS**

### UNITED STATES' SENTENCING MEMORANDUM

### I.      Introduction

Defendant Rick Lee Evans is scheduled to be sentenced on Wednesday, March 16, 2016. On December 11, 2015, a jury found Defendant guilty of the single-count Indictment charging him with aggravated sexual abuse of a child under the age of 12. This memorandum explains why the United States believes the appropriate sentence in this case is the same as the recommended Guidelines sentence of life imprisonment. First, scientific research shows that M.C. is at a substantially elevated risk for all manner of deleterious health consequences ranging from increased alcohol abuse to suicide attempt to premature mortality. Second, Defendant's military history should not be a mitigating factor, and, indeed, should arguably be an aggravating factor. Third, a life sentence is reasonable on these facts. Fourth, the Guidelines were correctly calculated, including the pattern of activity adjustment, thereby resulting in a recommended sentence of life.

## II.   Summary of the Facts

At trial, the evidence showed that from approximately May 2007 to December 2008, M.C., who was 4-5 years old, resided in Germany with Defendant and his then-wife while M.C.'s mother and stepfather were deployed to Iraq in service to our country. During the approximately 18 months that M.C. lived with Defendant, he sexually molested M.C. on multiple occasions, including having M.C. touch his penis and attempting to get M.C. to eat his semen. Defendant would also rub his penis on M.C. and fondle her chest and genitalia.

As this Court knows, in addition to the child molestation charges in the Indictment, Defendant was convicted in Germany of possession of child pornography. On August 7, 2009, after M.C.'s outcry in the United States regarding Defendant's sexual abuse of her during her parents' deployment in 2007 and 2008, the German authorities executed a search warrant at Defendant's residence in Heidelberg. That search and a subsequent search of Defendant's storage unit yielded multiple items that corroborated the child's allegations of abuse, including the sex toys she described that Defendant used on her and the pornography Defendant made her watch as part of his grooming process. Included in that pornography were hundreds of photos and videos depicting prepubescent children engaged in sexual acts. Included in those videos of child pornography was one titled "5yo Girl Raped

2

By Daddy – Preteen – Child Pornography," which depicts precisely that: a very young prepubescent girl being vaginally raped by an adult male. Similarly, Defendant also possessed a video entitled "Babysitter And Girl 8yo-10yo Having Sex with Older Sister," and that too depicts a prepubescent girl being sexually abused, this time with sex toys, much like the ones Defendant used on M.C.

Towards the end of 2008, when it became clear that M.C.'s mother would soon be returning from deployment to resume full-time care of M.C., Defendant sought and obtained a position at a childcare facility in Germany despite the fact that Defendant had no prior experience in child care, childhood education, or early childhood development. Typically, Defendant worked the "Parent's Night/Day Out" functions that were provided for military personnel. Those functions usually happened during off-hours at the U.S. Army's Child Development Center. On multiple occasions, other adults observed Defendant engage in inappropriate behavior with prepubescent children and Defendant was reprimanded for his behavior several times.

For example, during the 2009 Easter weekend (Easter Sunday was April 12th in 2009), the Site Chief of Outreach Services, Child and Youth Services, observed Defendant with a seven-year-old girl sitting on his lap. A supervisor verbally counseled Defendant against that kind of behavior but Defendant simply responded

that he knew the child's parents and that Defendant was "cool with them." On another occasion, in early May 2009, adult witnesses observed Defendant calling over to him young girls, approximately 3-4 years old, and placing them on his lap, again for extended periods of time. On yet another occasion on approximately May 16, 2009, adult witnesses observed Defendant with a girl who was approximately four or five years old. According to one of the witnesses, Defendant bounced the little girl on his lap. The child was wearing a skirt, she sat straddled across his lap, and Defendant had her lie back on his legs. Defendant would then bring her back up to the sitting position and have her lie back again. This lasted for approximately 15-20 minutes. The teaching assistant who observed this confronted Defendant about the activity, but Defendant said it was okay. The teaching assistant then notified the Site Chief, who immediately instructed Defendant to stop.

In early July 2009, M.C. first made an outcry about Defendant's sexual abuse of her. M.C. made the initial outcry to her grandmother who is now deceased. Specifically, M.C. explained that Defendant taught her about sex and that he had her rub his "monster" that he kept in his shorts. M.C. further explained that Defendant had touched her with his "monster" and that he had also touched her vaginal and anal areas. On July 10, 2009, shortly after making the outcry to her grandmother, M.C. was interviewed by a professional forensic interviewer in Birmingham,

4

Alabama. On at least three occasions during the July 10 interview, M.C. identified Defendant as the person who taught her about sex. On November 30, 2009, a different professional forensic interviewer, this time with the U.S. Military Police School, conducted an interview with M.C. Again, on multiple occasions, M.C. identified Defendant as the person who taught her about sex. She further explained what sexual acts Defendant forced upon her and had her perform on him. In addition, just as in the first interview, M.C. explained that Defendant had her watch videos of people having sex.

On January 5, 2015, Defendant placed a phone call from jail to his then-girlfriend. During the course of that phone call, Defendant discerned that his girlfriend was upset about something. After some questioning, his girlfriend indicated that she had been cleaning out Defendant's vehicle and located something that disturbed her. Defendant immediately recognized what she was referring to, and asked if it was some Ziploc bags. His girlfriend confirmed as much, and Defendant immediately began saying that he could explain, that it was nothing to worry about, and that it was something that he had been doing for approximately 30 years. Later, Defendant said that he had been collecting for 30 years and that it began when he was young, going into community laundromats, opening up a washer, and taking

what was there. At one point during the conversation, Defendant's girlfriend expressed concern about how some of what she found was very "little sizes."

Shortly after the jail call in question, Defendant sent a letter to his girlfriend: "[a]s for the Ziplock [sic] baggies you found, that was the results [sic] of a fetish from my younger days." On November 19, 2015, FBI agents interviewed Defendant's girlfriend to inquire about the cryptic nature of that phone call from January 5th. Defendant's girlfriend explained that she found a Ziploc bag full of panties, many of which appeared to be the size belonging to young girls. Indeed, she explained that, being a woman and mother of young girls, she knew the difference between women's underwear and little girls' underwear, and these bags contained many of the latter. At Defendant's direction, she got rid of them.

## III.   The ACE Study: Childhood Sexual Abuse Substantially Increases the Risk of Suicide Attempts, Alcoholism, and Illicit Drug Use.

Defendant should be sentenced to life because his criminal conduct has a high likelihood of resulting in the premature death of M.C. While that sounds like an assertion borne of speculation and bordering on hyperbole, there is strong scientific support to show that because of the sexual abuse M.C. suffered at the hands of Defendant, M.C. is at an increased risk of falling prey to alcohol abuse, illicit drug use, sexual promiscuity, and suicide.

In the late 1990s, the Kaiser Permanente San Diego Health Appraisal Clinic,

a primary care clinic where more than 50,000 adult members of an HMO receive medical examinations, began a study to examine the long-term relationship between Adverse Childhood Experiences (ACEs) and a variety of health behaviors and health outcomes in adulthood. First, they took a survey of adults who were members of the Kaiser HMO to determine the number of ACEs experienced. An ACE was defined to include an experience occurring to the adult before the age of 18 such as verbal abuse, physical abuse, contact sexual abuse, a battered mother, household substance abuse, household mental illness, incarcerated household members, and parental separation or divorce. The survey data was collected in 1995-1997.

In early 2009, using the National Death Index mortality data, researchers analyzed how many of the 17,337 original survey respondents were deceased 10 years after the survey. The results were startling. "People with six or more ACEs died nearly 20 years earlier on average than those without ACEs." David W. Brown, et al, *Adverse Childhood Experiences and the Risk of Premature Mortality*, 37 AMERICAN JOURNAL OF PREVENTIVE MEDICINE 389-96 (2009). In other words, if a person in the control group lived to 79.1 years old, that same person will only live to age 60.6 years old if she experienced six or more ACEs before the age of 18.

While it is certainly alarming to know that serious negative experiences in childhood could be correlated with such a precipitous drop in life expectancy, the

ACE Study expressly observed that "[t]here are several reasons to believe that these estimates of the relationship between ACEs and premature death are *conservative*." (*Id*. at 394 (emphasis added).) Indeed, when the initial survey was conducted in 1995-1997, approximately 60% of the survey respondents were already 50 years or older. Given that fact, "it is reasonable to postulate that people who are exposed to ACEs (particularly multiple ACEs) are more likely (compared to those who are unexposed) to be aborted; die during childhood or young adulthood; be institutionalized; or be otherwise lost prior to the initiation of the ACE Study." (*Id*. 394-95.) In addition, the survey respondents were of a population who were enrolled in a major health plan at that time, i.e., "predominantly white, middle-class adults." (*Id*. at 394.) Due to these facts about the survey population, "the association between ACEs and premature all-cause mortality would be biased downward." (*Id*. at 395.) In other words, it is reasonable to conclude that an ACE victim's risk of premature mortality is even greater than the ACE Study results show.

Additional research using the same survey data has drilled deeper to better understand the relationship between the severity of the childhood *sexual* abuse (not just adverse childhood experiences) and the long-term health and social problems. *See* Shanta R. Dube, et al, *Long-Term Consequences of Childhood Sexual Abuse by Gender of Victim*, 28 AMERICAN JOURNAL OF PREVENTIVE MEDICINE 430-38 (2005).

First, the study bifurcated the population of sexual abuse victims by classifying them into "sexual abuse, no intercourse" and "intercourse." Intercourse was defined as answering yes to the question of whether any "adult, relative, family friend, or stranger ever" attempted or actually had "any type of sexual intercourse with you (oral, anal, or vaginal)."

Using those definitions and categories, the study showed that adult women who were sexually abused in the form of intercourse as a child, were 360% more likely to attempt suicide than women who had never been sexually abused as a child. (*Id*. at 432, Table 4.) Equally unsettling was that even the children who experienced non-intercourse sexual abuse (so-called "just fondling") were 80% more likely to attempt suicide than those who had never been sexually abused. Sadly, this data set does not (because it cannot) include actual suicides, which undoubtedly would increase the odds described in the study.

In addition to suicide risk, non-intercourse female child sexual abuse victims were 60% more likely to use illicit drugs ("street" drugs, e.g., meth, heroin, cocaine), and 50% more likely to have alcohol problems. Even worse, intercourse victims were 90% more likely to do each. (*Id*.)

Yet another analysis of the same data looked at whether exposure to ACEs increased the risk of adolescent pregnancy and fetal death. *See* Susan D. Hillis, et al,

*The Association Between Adverse Childhood Experiences and Adolescent Pregnancy, Long-Term Psychosocial Consequences, and Fetal Death*, 113 PEDIATRICS 320-27 (2004). Compared with women who did not report any ACEs, there was a 60% increased risk in adolescent pregnancy for those who experienced childhood sexual abuse. (*Id.* at 322.) More disturbingly, "a strong and independent trend was observed for the association between ACE score and fetal death as the outcome of the first pregnancy." (*Id.* at 323.) In other words, even an ACE score of 1 resulted in a 7.6% increased risk in that woman's first pregnancy resulted in fetal death. (*Id.*) Furthermore, "[a]s the ACE score rose in these younger women, the risk of fetal death as the outcome of the first pregnancy increased." (*Id.* at 323-24.) In sum, "the cumulative and chronic exposure to stress associated with ACEs during childhood led to an increased risk of nonviability for the infant, persisting through both the first and second pregnancies." (*Id.* at 325.)

Defendant, in his sentencing memorandum, argued that "the offense for which he was convicted does not rise to the level that supports a Life sentence" and "[a] Life sentence does not accurately reflect the nature and circumstances of this case." (Def.'s Sent. Mem. at 8.) Conspicuously absent from his sentencing argument is any mention of the long-term deleterious effects on M.C.'s life. Indeed, § 3553(a)(2)(A) instructs this Court to fashion a sentence "to reflect the seriousness of the offense,

to promote respect for the law, and to provide *just punishment* for the offense." (emphasis added).

The scientific articles interpreting the ACE Study very clearly demonstrate the profound long-term consequences of various kinds of adverse childhood experiences, especially childhood sexual abuse. For M.C., who was exposed to repeated sexual abuse by Defendant, including attempted oral intercourse, she now has a significantly increased risk of attempting suicide, using illicit drugs, and having alcohol problems. In addition, she is at substantially greater risk of getting pregnant as an adolescent, and, independent of when she gets pregnant, she is far more likely to have her first or second pregnancy end in the death of her baby before birth. Finally, there is an increased chance that she will die 20 years early. All because Defendant repeatedly chose to use her as a sexual object for his own base gratification. In short, Defendant has forever impacted M.C.'s life in ways that have significant long-term health consequences, and thus his abuse of her over an 18-month period will redound to her detriment in profound ways. Therefore, a sentence of life imprisonment would be both reasonable and appropriate—"just punishment" in § 3553(a) language—given the lifelong consequences that M.C. will likely experience due to Defendant's repeated and reprehensible acts.

### IV.   Military Service Is not a Mitigating Factor.

The military service by Defendant, M.C.'s mother, and M.C.'s step-father are well documented over the course of this case. Those who serve our country deserve tremendous credit for the sacrifices they make, but no such service grants a person *carte blanche* to sexually abuse a child.

Indeed, the military values duty, honor, and country. Key among these, however, is honor. That is why military discharges are characterized by the type of service – honorable vs. dishonorable. Without honor, a soldier, sailor, airmen, or marine is no more than a thug with a gun. There is nothing honorable about sexually exploiting children. There is nothing honorable about manipulating a 5-year-old into masturbating you and then trying to get that child to eat your semen by showing the child that the dogs will eat it. There is nothing honorable about grooming a child by forcing the child to watch videos of the most vulnerable among us being raped and sodomized, all the while pleasuring yourself. This defendant is therefore without honor, and, thus, to the extent that he tries to use military service as a mitigating factor, he should be ashamed and embarrassed.[1]

At trial, Defendant attempted to portray M.C.'s parents as neglectful of their 5-year-old child. That characterization was as dishonest as it was offensive. M.C.'s

---

[1] In his sentencing memorandum, Defendant listed his service awards and concluded by reiterating that "Mr. Evans has served his country." (Def.'s Sent. Mem. at 2 and 12 .)

parents made a commitment to our country; a commitment borne of duty and honor. When it came time for them to go into a combat zone in Iraq, they did not cut-and-run when the going got tough. They made a decision to live the principles of duty and honor, in the hopes that not only would it be of service to our country, but that it would teach M.C. a life lesson about those great principles. In the cruelest of ironies, Defendant took advantage of M.C.'s parents instructing M.C. from afar to always obey Defendant. She obeyed his commands to sexually gratify him. M.C.'s parents were sent to fight an evil overseas, but the real evil was within their midst.

It is disgraceful for Defendant to hide behind service ribbons. He should have the strength of character to man up to the bar and pay the tab. He should not hide behind service ribbons. We can thank him for his service. We should facilitate his ability to receive disability payments from the VA. But please send this man to prison for the rest of his life, for he dishonors every man and woman who has ever worn the uniform or carried this country's flag into battle.

### V.    A Life Sentence Is Reasonable On These Facts.

In thinking about the relative culpability of Defendant, it is important to recall that Congress created the range of 30-Life for a single violation. In other words, in Congress's estimation, a defendant who commits *one* under-the-clothes touching of an *eleven*-year-old would be subject to a sentence between 30 years and life

imprisonment. Here, by contrast, we have *multiple* under-the-clothes touchings of a *five*-year-old.

In *United States v. Joey*, 14-CR-08122 (D. Ariz. Mar. 4, 2015), the defendant was charged with a § 2241(c) violation, but ultimately convicted of the lesser offense of abusive sexual contact in violation of § 2244(a)(5). The contact included one under-the-clothes touching of an 8-year-old boy's penis, an over-the-clothes touching of that boy's penis, as well as over-the-clothes touching of the chest area of a 9-year-old girl. His Guidelines range was 324-405 months, but the Court sentenced him to life.

Here, we have something far more egregious. First, M.C.'s extremely young age, being 4-5 years old when in Defendant's custody, is a fact justifying a sentence well above the minimum. Second, he committed substantially more than a solitary act. Indeed, this Court will recall M.C.'s vigorous hand gestures of how she was forced to masturbate Defendant to climax. Her disturbingly accurate replication of those gestures demonstrates a muscle memory that only comes from frequent repetition. Moreover, Defendant's conduct went well beyond the minimum envisioned in the statute when he forced M.C. to engage in degrading behavior, such as smelling and eating his semen, as well as feeding his semen to the dogs in an effort to get M.C. to eat it herself. For these reasons, a sentence of life would

certainly be appropriate and reasonable, but, at the very least, these reasons militate in favor of a sentence well above the minimum.

Similarly, in *United States v. Colwell*, 11-CR-182 (E.D.VA May 24, 2012), the court sentenced an active duty sailor to 480 months in prison for sexually abusing a 9-year-old girl for about 18 months. The defendant had no criminal history and pled guilty. Due to his guilty plea, which spared the victim from the trauma of having to testify, the United States agreed to a sentencing range of 420-480 months, and the court sentenced him at the top end of that range.

Here, M.C. was not spared the trauma of testifying, there is no agreement about the sentencing range, and M.C. was half as old as the child in that case. All of these facts should influence the conclusion that Defendant merits a sentence well above 480 months, and, indeed, closer to life. A life sentence for the 18-month-long repeated grooming and aggravated sexual abuse of a five-year-old girl while her parents were serving our country would not be substantively unreasonable. Quite the contrary, a sentence *below* life would require this Court to go out of its way to justify something less than the Sentencing Guidelines recommend.[2]

---

[2] Nevertheless, to the extent this Court is disinclined towards a life sentence, the United States urges the Court to ensure that Defendant has a very small chance of living outside of prison. Generally speaking, the Bureau of Prisons allows an inmate to receive approximately 54 days per year of "good time" credit towards a reduction in the Defendant's sentence. *See* https://www.fd.org/docs/select-topics---

Indeed, even if Defendant were imprisoned long enough that he would be *less likely* to commit sexual assaults on children, scholarly research in this area demonstrates that sexual predators like Defendant will simply change their *modus operandus*. Matt Hart, *The Geriatric Sex Offender: Senile or Pedophile?*, 32 LAW & PSYCHOL. REV. 153 (2008) ("Generally, older sex offenders engage in more passive sexual activity as compared to their younger counterparts. For example, fondling by elderly offenders is more prevalent than intercourse. Research has shown that elder offenders are more likely to commit 'nonviolent' sexual offenses such as pedophilia or exhibitionism as opposed to 'violent' offenses such as forcible rape. Specific examples of these 'nonviolent' offenses include improperly touching an acquaintance, statutory rape, exposing of the genitals (usually to a minor), and other acts of exhibitionism.") It is beyond peradventure that Defendant's 30-year collection of strangers' panties, combined with his desire to seek out employment

---

bop/fed_bop_merchant.pdf   (last accessed March 5, 2016). That roughly equates to a 15% reduction on the defendant's sentence if he acquires all of his good time credits throughout the course of his imprisonment. If the Court is inclined towards a round number of 100 years old as the goal for when Defendant should be eligible for release, the United States suggests a sentence of 68 years (816 months). A sentence of 68 years, accounting for a 15% reduction through good time credit, would result in Defendant being eligible for release in about 58 years, or when he is approximately 100 years old.

that put him in close proximity to young children is enough to demonstrate that he has a deviancy that has and will continue to put the community at risk regardless of his age. Accordingly, a sentence substantially above the minimum is imperative to adequately protect the community from Defendant.

## VI.   § 4B1.5 Pattern of Activity Adjustment

In Defendant's objections to the PSR, he specifically objected to the pattern of activity adjustment under § 4B1.5(b). For the adjustment to apply, there must be a preponderance of evidence that Defendant engaged in the sexual abuse of M.C. on at least two occasions. The evidence at trial, from the Child Advocacy Center videos to M.C.'s testimony, clearly established that Defendant committed these acts on at least two occasions, if not dozens. Thus, the Guidelines were correctly calculated, and Defendant remains subject to a presumptively reasonable sentence of life.

## VII.   Conclusion

This Court has the opportunity to bring security to the community by guaranteeing that it never has to worry about this child predator again. This Court also has the opportunity to provide Defendant's victim with a chance at peace and closure by ensuring that Defendant receives the most severe punishment allowed under the law so that M.C. is likewise ensured that Defendant may never harm her again.

Defendant abused M.C. for about 18 months, but in so doing, he gave her a lifetime of hard conversations. To really know M.C. is to know about Defendant and what he did to her. Forevermore, M.C. will have to have embarrassing, stressful, awful conversations with every friend she ever has, ever boy she ever dates seriously, and some day her own kids. It is one of the burdens that Defendant saddled M.C. with for the rest of her life. It is an albatross of anxiety whose stinking, rotting corpse cannot be buried, but instead must be shouldered by M.C. until she herself is laid to eternal rest. Her life is forever changed in the most profound ways; his life should be forever behind bars where children cannot be further harmed by him.

Respectfully submitted,

JOYCE WHITE VANCE
United States Attorney


*/s/ Jacquelyn M. Hutzell*
JACQUELYN M. HUTZELL
Assistant United States Attorney


*/s/ Austin M. Berry*
Austin M. Berry
Trial Attorney

<u>Certificate of Service</u>

I hereby certify that a true and correct copy of the foregoing was filed Sunday, March 13, 2016 via CM/ECF, which will cause a copy to be sent to Defendant's Attorneys.


*/s/ Austin M. Berry*
AUSTIN M. BERRY
Trial Attorney